22 P.3d 513

**ARIZONA DEPARTMENT OF
ECONOMIC SECURITY,**
Petitioner,

v.

**Hon. John S. LEONARDO,** Judge of the
Superior Court of the State of Arizona,
in and for the County of Pima, Respon-
dent,

and

**Melissa N., Mitchell N., Mark N., and
Matthew N., Real Parties in
Interest.**

**No. 2 CA–SA 01–0023.**

Court of Appeals of Arizona,
Division 2, Department B.

May 3, 2001.

Suzanne Laursen, Tucson, for Real Party in Interest Mitchell N.

Scott Schlievert, Tucson, for Real Parties in Interest Mark N. and Matthew N.

Mitchell Wendell and Dennis Eshman, Washington, D.C., for Amicus Curiae Association of Administrators of the Interstate Compact on the Placement of Children.

## OPINION

ESPINOSA, Chief Judge.

¶ 1 In this special action, we are asked to decide whether the Interstate Compact on the Placement of Children (ICPC), A.R.S. §§ 8–548 through 8–548.07, applies to the court ordered placement of children with a noncustodial, out-of-state parent. Because this purely legal question is of state-wide importance, *Fiveash v. Superior Court*, 156 Ariz. 422, 752 P.2d 511 (App.1988), and because petitioner Arizona Department of Economic Security (ADES) has no equally plain, speedy, and adequate remedy by appeal, Rule 1, Ariz. R.P. Special Actions, 17B A.R.S., we have accepted jurisdiction of this special action.[1] Based on the ICPC regulations, the purpose and policy of the compact, and our adoption of the view held by the majority of jurisdictions that have addressed this question, we conclude that the respondent judge erred as a matter of law in finding the ICPC inapplicable. Because the respondent judge exceeded his jurisdiction by placing the real parties in interest, Mark N. and Matthew N., with their mother, real party in interest Melissa N., in violation of the ICPC, we grant relief. *See Pima County Juvenile Action No. 18635 v. Fisher*, 125 Ariz. 430, 610 P.2d 64 (1980) (finding juvenile court exceeded jurisdiction by authorizing foster parents to release child to persons in another state in violation of ICPC).

## FACTS AND PROCEDURAL BACKGROUND

¶ 2 The marriage of Melissa N. and real party in interest Mitchell N. was dissolved by a decree of divorce entered by the Orange

Janet Napolitano, Arizona Attorney General, By Marianne I. Hardin and Michelle R. Nimmo, Tucson, for Petitioner.

Phillip H. Larriva, Tucson, for Real Party in Interest Melissa N.    .

---

1. We accepted jurisdiction on March 23, 2001, after ADES filed its petition and the mother and the father filed responses.

County District Court of Texas on June 13, 1990. The parties are the parents of four children, including Mark, born June 22, 1985, and Matthew, born December 6, 1986.[2] The Texas court appointed Mitchell "Sole Managing Conservator" of the children, granting him "all the rights, privileges, duties, and powers of a parent, subject only to the rights, privileges, duties, and powers granted" to Melissa as the children's "possessory conservator." Melissa concedes that, under Texas law, this was tantamount to an award of sole custody of Mark and Matthew to Mitchell, subject to Melissa's visitation rights, which were set forth in the decree. Tex. Fam.Code Ann. §§ 101.019 (West 1996) (defining "managing conservatorship" as "relationship between a child and a managing conservator appointed by court order"); 153.251 (outlining policy and guidelines for standard possession order, intended to guide courts in ordering terms and conditions for possession of a child by a parent named possessory conservator). Shortly after the parties were divorced, Mitchell moved with the children to Arizona, where they have since resided.

¶ 3 On March 6, 2001, Child Protective Services (CPS) took Mark and Matthew into custody after it was reported that Mitchell and his new wife were neglecting and abusing them. Based on the verified allegations of ADES's dependency petition, the respondent judge found in his March 9 temporary orders that "it was reasonable to make no efforts to maintain the children in the home" and awarded ADES temporary legal and physical custody of the children. *See* A.R.S. § 8–822; Ariz. R.P. Juv. Ct. 48(B), 17B A.R.S.

¶ 4 In accordance with A.R.S. § 8–824 and Rule 50, Ariz. R.P. Juv. Ct., the respondent judge held a preliminary protective hearing on March 15. By that time, Melissa and Mitchell had been served with the dependency petition. All parties were represented by counsel. Mitchell did not contest ADES's continued temporary custody of the children and waived his right to a hearing. He did, however, object to placement of the children with Melissa without a home study and compliance with the ICPC. Melissa insisted that the respondent judge proceed with the hearing and testified telephonically from Texas. She objected to ADES's continued custody of the children and requested that they be placed with her in Texas. CPS's investigative caseworker also testified, reporting preliminary information he had obtained about Melissa, but stated he had not had sufficient time to complete a background check on her and that the equivalent of CPS in Texas had not responded to his specific inquiries. The caseworker did not believe it was in the children's best interests to be placed with their mother because "there are too many questions at this point to allow the boys to go there," adding, "We don't have enough information." He testified that Mark had not seen his mother in almost three years and that Matthew had seen her during the summer of 2000, apparently while visiting his paternal grandparents in Texas.

¶ 5 Melissa denied allegations that she had a substance abuse problem, denied that she had ever abused the children, and claimed she had had no involvement with CPS in Texas. She insisted she had a suitable home for the children. Mitchell and ADES objected to placing the children with Melissa until ADES could comply with the ICPC, arguing Texas would have to approve the children's placement there, after finding it "does not appear to be contrary to the interests of the child[ren]." *See* § 8–548, Art. III(d). At the end of the hearing, the respondent judge found that ADES had failed to establish probable cause to believe the children would be subject to abuse or neglect if they were placed with Melissa. *See* § 8–824(F). The judge ordered the children to be removed from their current placement in a shelter and placed with Melissa if she came for them. The court further ordered her to cooperate with a background check and home study.

¶ 6 The next day, ADES filed a motion for reconsideration and a request that the ruling on the motion be expedited, asking the respondent judge to reconsider his factual findings and, alternatively, to give ADES time to comply with the ICPC by obtaining the nec-

2. The other two children are now adults.

essary authorization from Texas. The judge denied the motions, finding that ADES had not presented any new facts in its motion to change his finding that ADES had not established probable cause to believe that placement of the children with Melissa would clearly subject them to abuse or neglect. And, the judge concluded that, based on Article III(a), § 8–548, the ICPC is inapplicable "to return of custody to a biological parent as occurred here."

¶ 7 ADES immediately asked this court to stay the respondent judge's March 15 order. After a hearing, we granted the stay and set a briefing schedule on ADES's forthcoming petition for special action and responses by the real parties in interest. On March 23, we accepted jurisdiction of this special action, permitted further briefing, and granted the request by the Association of Administrators of the Interstate Compact on the Placement of Children (AAICPC) to either join in ADES's petition or file an amicus brief; AAICPC chose the latter and filed its brief the following week. We ordered ADES to continue its efforts to comply with the ICPC while this special action was pending, directing it to proceed as expeditiously as possible, and continued our previous order staying the respondent judge's March 15 order. Additionally, we found the respondent judge had not abused his discretion by finding that ADES had failed to establish at the preliminary protective hearing probable cause to believe that placement of the children with Melissa would clearly result in their abuse or neglect pending the hearing on the dependency petition. We now address the question whether the respondent judge exceeded his jurisdiction by finding the ICPC inapplicable to the out-of-state placement of these children with their noncustodial mother.

### THE ICPC

¶ 8 An interstate compact is " 'an agreement between two or more states, entered into for the purpose of dealing with a problem that transcends state lines.' " *In re Adoption No. 10087,* 324 Md. 394, 597 A.2d 456, 461 (1991), *quoting* P. Hardy, *Interstate Compacts: The Ties That Bind* 2 (1982). When adopted by a state, the compact is not only an agreement between that state and the other states that have adopted it, but it becomes the law of that state as well. *Adoption No. 10087.* The ICPC was drafted in the late 1950s to address concerns about the interstate adoption and foster care placement of children. Kimberly M. Butler, *Child Welfare—Outside the Interstate Compact on the Placement of Children—Placement of a Child with a Natural Parent,* 37 Vill. L.Rev. 896 (1992). Arizona adopted the ICPC in 1976. 1976 Ariz. Sess. Laws, ch. 17, § 1. All fifty states are now participating members. *See* Historical and Statutory Notes to § 8–548.

¶ 9 The ICPC expressly defines its purpose and policy as facilitating cooperation between states in the placement and monitoring of dependent children. § 8–548, Art. I; *J.D. S. v. Franks,* 182 Ariz. 81, 893 P.2d 732 (1995); *In re Johnny S.,* 40 Cal.App.4th 969, 47 Cal.Rptr.2d 94 (App.1995); *see also In re Adoption of A.M. M. and A.N.M.,* 24 Kan. App.2d 605, 949 P.2d 1155, 1158 (1997) ("The purpose of the ICPC is to protect the interests of children who fall within its parameters."); Butler, *supra* at 906 ("The [ICPC] is geared toward gathering information prior to placement in order to ensure that the sending and receiving states work together to place the child in a good environment, and toward monitoring and providing care for the child following placement."). The ICPC states that its intent is to ensure that:

(a) Each child requiring placement shall receive the maximum opportunity to be placed in a suitable environment and with persons or institutions having appropriate qualifications and facilities to provide a necessary and desirable degree and type of care.

(b) The appropriate authorities in a state where a child is to be placed may have full opportunity to ascertain the circumstances of the proposed placement, thereby promoting full compliance with applicable requirements for the protection of the child.

(c) The proper authorities of the state from which the placement is made may obtain the most complete information on

the basis of which to evaluate a projected placement before it is made.

(d) Appropriate jurisdictional arrangements for the care of children will be promoted.

§ 8–548, Art. I.

¶ 10 Article III of the ICPC prescribes the conditions for placement of a child in another state. Subsection (a) provides:

[N]o sending agency shall send, bring, or cause to be sent or brought into any other party state any child for placement in foster care or as a preliminary to a possible adoption unless the sending agency shall comply with each and every requirement set forth in this article and with the applicable laws of the receiving state governing the placement of children therein.

§ 8–548, Art. III(a). Similarly, subsection (b) requires that, before a state may send a child to a "receiving state for placement in foster care or as a preliminary to a possible adoption," the sending state must provide "the appropriate public authorities in the receiving state written notice of the intention to send, bring, or place the child in the receiving state."[3] § 8–548, Art. III(b). Subsection (d) provides that a child who is the subject of such a notice may not be "sent, brought, or caused to be sent or brought into the receiving state until the appropriate public authorities in the receiving state shall notify the sending agency, in writing, to the effect that the proposed placement does not appear to be contrary to the interests of the child." § 8–548, Art. III(d).

¶ 11 The ICPC defines "sending agency" as "a party state, officer or employee thereof; a subdivision of a party state, or officer or employee thereof; a court of a party state; a person, corporation, association, charitable agency or other entity which sends, brings or causes to be sent or brought any child to another party state." § 8–548, Art. II(b). The "receiving state" is "the state to which a child is sent, brought or caused to be sent or brought, whether by public authorities or private persons or agencies, and whether for placement with state or local public authorities or for placement with private agencies or persons." § 8–548, Art. II(c).

¶ 12 The ICPC defines "placement," in relevant part, as "the arrangement for the care of a child in a family free or boarding home or in a child-caring agency or institution." § 8–548, Art. II(d). And Article VIII(a) provides that the ICPC does not apply to "[t]he sending or bringing of a child into a receiving state by his parent, step-parent, grandparent, adult brother or sister, adult uncle or aunt, or his guardian and leaving the child with any such relative or non-agency guardian in the receiving state." But, pursuant to Article VII, which authorizes the AAICPC as administrator of the ICPC "to promulgate rules and regulations to carry out more effectively [its] terms and provisions," the AAICPC promulgated Regulation No. 3.[4] It provides, in relevant part:

The following regulation adopted by the Association of Administrators of the Interstate Compact on the Placement of children is declared to be in effect on and after April 30, 2000.

1. "Placement" as defined in Article II(d) includes the arrangement for the care of a child in the home of his parent, other relative, or non-agency guardian in a receiving state when the sending agency is any entity other than a parent, relative, or

---

**3.** The subsection sets forth additional information the notice must contain, including the child's name and date and place of birth; the identity of the parents or legal guardian and their addresses; "[t]he name and address of the person, agency or institution to or with which the sending agency proposes to send, bring, or place the child"; and the reasons for the action and authority for the proposed placement. § 8–548, Art. III(b). Subsection (c) authorizes the public officer or agency in a receiving state to ask the sending state for "supporting or additional information as it may deem necessary under the cir-

cumstances to carry out the purpose and policy of this compact." § 8–548, Art. III(c).

**4.** It appears that portions of the regulation were promulgated before the Third Circuit Court of Appeals decided *McComb v. Wambaugh*, 934 F.2d 474 (3d Cir.1991), upon which Melissa relies and which is discussed below. But its current version, which appears to have added subsection 3, was promulgated during the AAICPC's annual meeting of April 30, 2000, through May 3, 2000, and was declared effective on and after April 30, 2000. *See* ICPC Reg. 3.

non-agency guardian making the arrangement for care as a plan exempt under Article VIII(a) of the Compact.

. . . .

3. Article VIII(a) of this Compact applies only to the sending or bringing of a child into a receiving state to a parent or other specified individual by a parent or other specified individual whose full legal right to plan for the child has been established by law at a time prior to initiation of the placement arrangement, and has not been voluntarily terminated, or diminished or severed by the action or order of any Court.

¶ 13 Based on this regulation, when the sending agency is a child protective services agency acting through the state, as it is here, and the child is placed with a parent or other family member who does not have full custodial rights to or guardianship of the child, the ICPC applies to that out-of-state placement.[5] The respondent judge concluded that the ICPC is inapplicable to the "return of custody [of a child] to a biological parent" because the language in Article III(a) appears to limit application of the ICPC to "placement [of a child] in foster care or as a preliminary to a possible adoption." The respondent judge did not mention Regulation 3.

## APPLICABILITY OF ICPC TO OUT-OF-STATE PLACEMENT OF CHILDREN WITH NONCUSTODIAL PARENT

■ ¶ 14 ADES contends that, as a compact member, Arizona must follow AAICPC's regulations. And, ADES insists that Regulation 3 is consistent with the policy and purpose of the ICPC and with the majority of jurisdictions that have found the compact applicable to the out-of-state placement of children with parents. Melissa, on the other hand, contends Regulation 3 conflicts with the ICPC. She relies primarily on *McComb v. Wambaugh,* 934 F.2d 474 (3d Cir.1991), in which the Third Circuit Court of Appeals

refused to follow the regulation, finding it contrary to the compact. She also relies on *Johnny S.* and *Tara S. v. Superior Court,* 13 Cal.App.4th 1834, 17 Cal.Rptr.2d 315 (App. 1993), in which California appellate courts refused to follow an opinion of that state's attorney general and a regulation promulgated by the California Health and Welfare Agency. Melissa urges us to disregard Regulation 3 and find the ICPC inapplicable to her.

¶ 15 As we previously noted, Regulation 3 was promulgated by the AAICPC pursuant to Article VII. That article established the administrator of the ICPC, requiring that it be comprised of officers chosen by the executive head of each jurisdiction that is a party to the ICPC. Consistent with Article VII, A.R.S. § 8–548.02 provides that Arizona's governor shall designate the director of ADES as Arizona's compact administrator and AAICPC representative. Virtually mirroring Article VII, § 8–548.02 further provides that Arizona's "compact administrator, acting jointly with like officers of other party states, shall promulgate rules and regulations to carry out more effectively the terms of the compact." The statute adds that "[t]he compact administrator shall cooperate with all departments, agencies and officers of and in the government of this state and its subdivisions in facilitating the proper administration of the compact or of any supplementary agreement or agreements entered into by this state thereunder."

■ ¶ 16 By adopting the ICPC, enacting § 8–548.02, and delegating a representative of this state to participate in the activities of the AAICPC, Arizona has implicitly agreed to accept and abide by rules or regulations duly promulgated by the AAICPC. We are, however, mindful of the general rule that an agency or administrative body may not enact rules or regulations that conflict with a statute. *See, e.g., Arizona State Bd. of Regents v. Arizona State Personnel Bd.,* 195 Ariz. 173, 985 P.2d 1032 (1999) (finding

---

5. In a handbook it prepared, the AAICPC includes among the four types of situations to which the ICPC applies "[p]lacements with parents and relatives when a parent or relative is not making the placement." *Guide to the Interstate*

*Compact on the Placement of Children* 2 (Secretariat to the Association of Administrators of the Interstate Compact on the Placement of Children, affiliate of the American Public Human Services Association, 2000).

that university could not exempt itself from rights to counsel and subpoena provisions provided claimants by Administrative Procedure Act); *Dioguardi v. Superior Court*, 184 Ariz. 414, 909 P.2d 481 (App.1995) (finding invalid procedural rule promulgated by Board of Medical Examiners on time for filing motions for rehearing because it conflicted with statutory mandate). Even more on point, a state may not enact laws that conflict with a compact the state has adopted. *See State ex rel. Dyer v. Sims*, 341 U.S. 22, 71 S.Ct. 557, 95 L.Ed. 713 (1951); *McComb; see also* A.R.S. § 1–104(A)(8) (prohibiting adoption, enactment, construction, or repeal of statutes "to affect or modify ... [a]ny statutes authorizing, ratifying, confirming, approving or accepting any compact or contract with any other state or with the United States or any agency or instrumentality thereof"). Therefore, Regulation 3 is binding on this state, so long as it is consistent with the purpose and the policy of the ICPC.

██ ¶ 17 Construing the ICPC liberally in order to effectuate its policy and purpose, as Article X of the ICPC expressly directs, we conclude Regulation 3 is consistent with the compact. It is not contrary to the description of "placement" in Article III(a) ("placement in foster care or as a preliminary to a possible adoption") to find that the description includes placement of a child who is the subject of a protective action and in the legal custody of the state in a home with an out-of-state parent whose rights have been "diminished or severed by the action or order of any Court." ICPC Reg. 3. Nor is Regulation 3 contrary to the definition of "placement" in Article II(d) ("the arrangement for the care of a child in a family free or boarding home or in a child-caring agency or institution.") We likewise find that Regulation 3(3), which makes the ICPC inapplicable to parents whose "full legal right to plan for the child

has been established by law at a time prior to initiation of the placement," is consistent with the purpose and policy of the ICPC. We base this conclusion on Arizona's child welfare and placement statutes, the ICPC's stated purpose and policy, and cases from the majority of jurisdictions that have considered this issue.

¶ 18 For guidance we first turn to Arizona's child welfare and placement statutes, Title 8, chapter 5, A.R.S. For purposes of those statutes, "[f]oster home" is defined generally as "a home maintained by any individual or individuals having the care or control of minor children, other than those related to each other by blood or marriage, or related to such individuals, or who are legal wards of such individuals." A.R.S. § 8–501(4). For a home to be a foster home, it must be licensed in accordance with the requirements of A.R.S. § 8–509. *See generally* A.R.S. § 8–514 (ADES or a licensed child welfare agency may place a child in a licensed foster home for care or for adoption). Prospective foster parents must complete training in accordance with A.R.S. § 8–503, and the home must be investigated before a license may be issued. § 8–509(B), (E). However, notwithstanding the language of § 8–501(4), a relative may serve as a foster parent; A.R.S. § 8–514.03 provides for kinship foster care, that is, foster care by a nonparent family member. *See* § 8–501(A)(12) (defining relative); *see also* A.R.S. § 8–514.04 (establishing kinship care program). Like nonkinship foster homes, a kinship foster care parent and all household members must be thoroughly investigated before the child may be placed with the family. § 8–514.03(B).[6]

¶ 19 Even though "kinship foster home" does not, by definition, include a parent's home, A.R.S. § 8–514.02(A) makes placement

---

6. Melissa insists that interpreting "foster care" as including placement with family members is precluded by the term, "family free ... home" in Article II(d) of the ICPC. Our supreme court, however, has interpreted this term to mean "a home where the child lives without charge and receives 'the care which children usually receive from their parents as part of the process of upbringing.'" *J.D.S. v. Superior Court*, 182 Ariz. 81, 89, 893 P.2d 732, 740 (1995), *quoting* Berna-

dette W. Hartfield, *The Role of the Interstate Compact on the Placement of Children in Interstate Adoption*, 68 Neb. L.Rev. 292, 298 (1989), *quoting* American Public Welfare Association, I *The Interstate Compact on the Placement of Children: Compact Administrators' Manual* 2.2 (1982). Thus, the term does not necessarily exclude a parent from the category of individuals who may provide that care.

with a parent an alternative placement for a child subject to the child welfare and placement statutes. *See also* A.R.S. § 8–824(I) (requiring court to enter orders on "placement" of child pending dependency proceeding and allowing visitation if child not placed with parent). But if a child is placed with a parent in Arizona in connection with a pending or ongoing dependency proceeding, the parent is offered services and closely monitored. *See, e.g.,* A.R.S. §§ 8–824(I), 8–825(C), 8–826, and 8–843(D). And, any time there is probable cause to believe the child will clearly suffer abuse or neglect, the child may be removed from the home. *See* § 8–824; Ariz. R.P. Juv. Ct. 50. If the child is in another state, however, it is virtually impossible, both practically and legally, for ADES to provide services and monitor the child's situation.

■ ¶ 20 Significantly, Regulation 3 limits application of the ICPC to placement of children with parents whose rights have been terminated or diminished, in contrast to those parents whose "full legal right to plan for the child has been established by law at a time prior to initiation of the placement." ICPC Reg. 3(3). The reason for this limitation is apparent. If a parent has full custodial rights following a dissolution proceeding, presumably there has been a judicial determination that the person is a fit parent. *See, e.g.,* A.R.S. § 25–403. Just as the issuance of a license to a foster home permits the general inference that a determination has been made that the home is a safe placement for a child, an award that is tantamount to full custody permits the same inference, rebuttable though it may be. In contrast, if a parent's rights have been diminished by court order, no inference of fitness for placement may be made. This is not to say that the parent may be presumed to be unfit; rather, he or she must be investigated to ensure that the child would be safe if placed with that parent and, thereafter, provided any necessary services. Without the ICPC, ADES would lack the legal authority to arrange for services in another state and it would be patently impractical, both in terms of ADES staff time and expense, to require an ADES caseworker to travel to another state to investigate the propriety of a place-

ment. The ICPC best safeguards a child's welfare by requiring the receiving state to investigate and monitor the placement.

¶ 21 As previously stated, Melissa relies to a large extent on *McComb*. *See also Nance v. Arkansas Dep't of Human Servs.,* 316 Ark. 43, 870 S.W.2d 721 (1994); *Johnny S.* (citing *McComb* with approval and finding ICPC inapplicable to placement with out-of-state parent); *Tara S.* (same). The *McComb* court found Regulation 3(1) inconsistent with the ICPC. The decision did not address Regulation 3(3), which appears to have been added during the AAICPC's April 2000 meeting, after *McComb* was decided. Regulation 3(3) circumscribes application of the ICPC to out-of-state parents whose rights have been terminated or diminished. Moreover, we find the *McComb* court's strict and narrow construction of the ICPC contrary to the mandate of Article X that its "provisions ... be liberally construed to effectuate the purposes thereof." We agree instead with the majority of jurisdictions that have found the ICPC applicable to out-of-state placement of a child with a non-custodial parent. *See, e.g., D.S.S. v. Clay County Dep't of Human Resources,* 755 So.2d 584 (Ala.Civ.App.1999); *Department of Children and Families v. Benway,* 745 So.2d 437 (Fla.App.1999); *In re Adoption of Warren,* 44 Mass.App.Ct. 620, 693 N.E.2d 1021 (1998); *In re Custody of Quincy,* 29 Mass.App.Ct. 981, 562 N.E.2d 94 (1990); *K.D. G.L. B.P. v. Hinds County Dep't of Human Servs.,* 771 So.2d 907 (Miss. 2000); *State ex rel. Juvenile Dep't of Clackamas County v. Smith,* 107 Or.App. 129, 811 P.2d 145 (1991).

¶ 22 We find particularly instructive the Florida appellate court's reasoning in *Benway.* That court held that the ICPC prohibited the trial court from ordering the Department of Children and Families to send a child who had been adjudicated dependent in Florida as to the mother to Vermont to be placed with her noncustodial father because Vermont authorities had disapproved that placement. The out-of-state father had argued, as Melissa does here, that the ICPC did not apply because it refers to the transfer of a child "for placement in foster care or as a preliminary to a possible adoption," § 8–

548, Article III(b), neither of which exists when a child is being sent to live with a parent. Curiously, the court in *Benway* did not rely on or mention the regulations in concluding that the ICPC applied. Rather, the court simply rejected the *McComb* court's strict interpretation of the ICPC, noting, as do we, that Article X of the ICPC requires a liberal construction. Pointing out that the primary purpose of the ICPC is to protect children by making certain they are placed in a safe environment, the *Benway* court adopted the majority view, stating:

> Once a court has legal custody of a child, it would be negligent to relinquish that child to an out-of-state parent without some indication that the parent is able to care for the child appropriately. The ICPC provides an effective mechanism for gleaning that evidence and for maintaining a watchful eye over the placement.

745 So.2d at 439.

¶ 23 Similarly, in *Adoption of Warren,* the Massachusetts Court of Appeals found the ICPC applicable to a noncustodial, out-of-state father. There, as here, the Department of Social Services (DSS) in Massachusetts had temporary custody of the child. The mother in that case, however, had relinquished her parental rights, and adoption proceedings had commenced. The trial court refused to allow the father to take the child to his home in New York because that state's social services agency had disapproved the placement. On appeal, the court rejected the father's claim that the ICPC did not apply to the sending or bringing of a child into another state by a parent for placement of the child with a member of the child's family. The court found that the child was not being sent into or brought into New York by his father because the father did not have custody of the child.

¶ 24 The court in *Adoption of Warren* also relied on two state regulations it found promulgated in accordance with the ICPC. The first provides that, "[w]henever a state agency has custody of a child or care of a child pursuant to a voluntary placement agreement, and such agency places a child with his/her parent(s) in another state, this constitutes a placement under the Interstate Compact." Mass. Regs.Code tit. 110, § 7.507(4). The court also relied on § 7.503(8), which provides that "[t]he Interstate Compact shall apply to any stay across state borders whenever the sending agency requests a home study or supervision of a child by the receiving state." Mass. Regs.Code tit. 110, § 7.503(8). DSS had asked the New York agency to conduct a home study of the father to determine whether he could care for his son. The father did not challenge the propriety of these regulations. Based on its interpretation of Article VIII of the ICPC and the regulations, the court concluded that Article III(d) prohibited Massachusetts from sending the child to live with his father in New York.

¶ 25 In an earlier decision, the Massachusetts appellate court emphasized the importance of the ICPC in ensuring that children are provided the services they need when placed in another state. *Custody of Quincy.* In that case, DSS had filed a protective action in Massachusetts based on the conduct of the mother and her boyfriend. The child, who apparently had serious emotional problems, was placed with the father in New Hampshire. Subsequently, the parties agreed the protective action could be dismissed, based on an informal understanding that Massachusetts would continue to provide the child services. Sometime later, service providers informed the father his son needed treatment after the child had set a fire and been injured. The father asked the Massachusetts court to vacate the dismissal of the protective action and requested a referral through the ICPC. In the meantime, the New Hampshire Department of Social Services took the position that it could not provide services to the child unless it had legal custody of him. Desperate to obtain services for his son, the father left him in a hospital in New Hampshire, which resulted in the filing of abandonment charges against him and gave New Hampshire the legal basis for taking custody of the child so it could provide him the services he needed.

¶ 26 Although the appellate court dismissed the appeal as moot because the father was ultimately able to obtain services for the child, the court nonetheless discussed how

instrumental the ICPC is in facilitating the safe placement and proper care of dependent or potentially dependent children out of state. The court stated:

> [W]e wish to reaffirm that 1) it is a child's right and a State's obligation to see that every child who is the subject of a care and protection petition receives services and treatment . . . ; 2) when a child who is the subject of an ongoing care and protection case is placed with the agreement and participation of Massachusetts in another State, the Interstate Compact should be followed to insure that services and treatment continue until they are determined to be no longer necessary; and 3) an Interstate Compact referral is the proper way to secure coordination of services between the two States.
>
> A final point, and of particular regret, is that the father was obliged to engage in a fabrication with the New Hampshire authorities by leaving the child at a hospital in order to obtain services in New Hampshire for his son. Had there been verification of residency by the department and an initial referral through the Interstate Compact, this unfortunate pretense and the undeserved stigma of being a neglectful parent could have been avoided.

562 N.E.2d at 96.

¶ 27 We find these cases persuasive and reject the *McComb* court's strict reading of the ICPC and its conclusion that Regulation 3, at least the portion it cited, is inconsistent with the ICPC. *See also* Butler, *supra* (criticizing *McComb* court's narrow construction of ICPC). Rather than conflicting with the ICPC, we hold that Regulation 3 is consistent with and serves the policy and purpose of the ICPC, to protect children from the type of situation that arose in *Custody of Quincy*. The ICPC is designed to provide a free exchange of information between participating states in order to serve its primary goal—finding a safe placement for children across state lines by enlisting the assistance of the receiving state, which is in a better position than the sending state agency to investigate the out-of-state placement to ensure that it is safe, to make certain that necessary services are provided, and to monitor the child's welfare. Narrowly tailored as it is by rendering the ICPC applicable to placement with parents whose rights have been terminated or diminished, Regulation 3 is all the more consistent with the ICPC. It is in the best interests of a child who is the subject of a dependency proceeding and in the custody of protective services to require an investigation by a receiving state on the suitability of a parent who does not have full custodial rights before placing the child with that parent.

¶ 28 Relying on the decision by Division One of this court in *Meryl R. v. Arizona Department of Economic Security,* 196 Ariz. 24, 992 P.2d 616 (App.1999), Melissa asserts that her lack of legal custody does not mean she is incapable of exercising parental care and control. *See* A.R.S. § 8–201(13)(a)(i) (defining dependent child as one "[i]n need of proper and effective parental care and control and who has . . . no parent or guardian willing to exercise or capable of exercising such care and control"). We agree with Melissa and with Division One in that regard. But, the children's dependency as to either Mitchell or Melissa at this juncture is not the issue. The narrow question in this case is whether the ICPC applies so that the propriety of the out-of-state placement of these children, who are the subjects of a pending dependency proceeding and temporary wards of this state, must be determined and monitored by the out-of-state authorities, who are in a better position to do so than ADES. Thus, even though Melissa's lack of legal custody does not mean the children are dependent as to her or even as to Mitchell, *Meryl R.,* it does place her within the category of persons to whom the ICPC applies, based on the language of the compact, its policy and purpose, and Regulation 3.

## NO VIOLATION OF DUE PROCESS RIGHTS

¶ 29 Finally, we summarily reject Melissa's claim that application of the ICPC to her violates her due process rights, even if she is "deprived" of her children for the relatively short period of time it may take a Texas agency to conduct a home study and

accept the placement.[7] We fail to see the analogy she asserts between this process and a prejudgment seizure of property. As ADES points out, children are not property. Their rights and needs and the state's interest in protecting children from abuse and neglect must be balanced against parental rights that may be implicated. *See In re Maricopa County Juvenile Action No. JD–561*, 131 Ariz. 25, 638 P.2d 692 (1981). Depriving Melissa of these children for a period of time so that their safety can be assured amounts to neither a substantive nor a procedural due process violation. The intrusion on her rights as a noncustodial parent is minimal. Melissa's claim is rendered even less compelling by the fact that she has not had physical, much less, legal custody of Mark or Matthew for at least the last eleven years.

## CONCLUSION

¶ 30 Because we find that the respondent judge erred in finding the ICPC inapplicable, we necessarily conclude that he acted in excess of his jurisdiction in ordering ADES to place Mark and Matthew with Melissa and in permitting her to take them with her to her home in Texas without first allowing ADES to comply with the ICPC. Accordingly, we vacate those portions of the March 15 and March 16 orders that so provide, and remand this matter to the respondent judge for further proceedings consistent with this decision.

DRUKE, Acting Presiding Judge and BRAMMER, Jr., Judge, concurring.

---

**7.** In a status report filed April 23, 2001, in accordance with this court's order of March 23, 2001, ADES advised this court that the Texas ICPC administrator has accepted this matter as a priority placement, *see* Regulation 7 of the ICPC, thereby expediting preparation of the home study in that state.