[No. 63624-3-I.   Division One.   August 2, 2010.]

*In the Matter of the Dependency of* D.F.-M.

ALYCE FABIAN-MILLER, *Petitioner*, v. THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, *Petitioner*, RICO VERNER, *Respondent*.

*Christopher Gibson* (of *Nielsen, Broman & Koch PLLC*) and *Gregory C. Link* (of *Washington Appellate Project*), for petitioners.

*Robert M. McKenna, Attorney General,* and *Michael S. Majors, Senior Counsel,* for respondent.

¶1 ELLINGTON, J. — This case requires us to decide whether the interstate compact on placement of children, ch. 26. 34 RCW, applies to parental placements. We hold it does not and affirm the trial court's decision to place D.F.-M. with his father in Oklahoma.

## FACTS

¶2 D.F.-M. was born on July 19, 2005. On December 22, 2005, a Washington court entered an order in a parentage action, finding that Rico Verner is D.'s father and designating his mother, Alyce Fabian-Miller, as his custodian. The order reserved the issue of a parenting plan for future determination upon motion by either party. No parenting plan was ever entered.

¶3 Starting in 2006, the Department of Social and Health Services (DSHS) received a series of referrals alleging neglect, domestic violence, and drug use by Fabian-Miller. In 2007, Fabian-Miller signed a voluntary service plan and a safety plan in response to the allegations. She failed to comply with the plans. In March 2008, DSHS placed her children, including D., in protective custody and filed dependency proceedings. At that point, DSHS did not know Verner's whereabouts, or what role he played in D.'s life. It was believed his last known address was in Tulsa, Oklahoma.

¶4 On April 16, 2008, the juvenile court entered an agreed order finding D. to be a dependent child as to Fabian-Miller and ordering that he be placed in DSHS-approved out-of-home care. Verner had yet to be served with the dependency petition and did not appear or otherwise participate. The court nevertheless ordered Verner to con-

tact DSHS to determine what services were necessary and to establish an appropriate visitation schedule.

¶5 Shortly thereafter, Verner learned that D. was in foster care. He contacted DSHS to express "extreme interest" in having his son placed with him.[1] He was served with the dependency petition. DSHS submitted a request to Oklahoma under the interstate compact on placement of children[2] (ICPC) seeking a home study regarding Verner and its agreement to supervise D.'s placement there. After a home study, Oklahoma declined to accept supervision. The Oklahoma social worker noted that Verner had never parented his child; had not completed a DSHS-recommended, although not court-ordered, parenting class; did not have a steady income; was attending school in the evenings and would not be able to parent the child should he become gainfully employed; drove a car without a driver's license or insurance; lacked a child's car seat; and "did not appear to be" honest with the social worker about a relationship he was involved in.[3] Oklahoma recommended reevaluating Verner after he completed a parenting class and became gainfully employed. DSHS was supportive of Verner's efforts to have D. placed with him but would not recommend placement absent Oklahoma's agreement.

¶6 Verner responded to the dependency petition, requesting that it be dismissed and that D. be placed with him. On October 20, 2008, he filed a motion seeking to have D. placed with him in Oklahoma. Verner had addressed some of the concerns cited by the Oklahoma social worker. He was employed, was approaching completion of his welding degree, and explained that his mother would help with D.'s care while he was at school or work. He had also ended the relationship the social worker had expressed concern about. The court denied the motion without prejudice and invited Verner to renote the motion once he had addressed the

---

[1] Clerk's Papers at 40.

[2] Ch. 26.34 RCW.

[3] Clerk's Papers at 151.

other concerns raised in the home study and had completed a parenting class.

¶7 By April 2009, Verner had completed a parenting course, moved in with his mother, completed school, was no longer in contact with his ex-girlfriend, was maintaining his employment while looking for opportunities in his new field, and was in the process of obtaining a driver's license. He was also having weekly phone contact with D. DSHS made a second request that Oklahoma agree to D.'s placement with Verner.

¶8 Oklahoma again refused, this time on grounds of inadequate housing. Under an Oklahoma policy, Verner's housing was inadequate because Verner, his mother, and D. would all live in a two-bedroom residence. The Oklahoma social worker who performed the home study did not visit the residence but assessed it based on a telephone conversation with Verner.

¶9 On May 28, 2009, Verner renewed his motion to have D. placed with him. In the meantime, he had acquired a vehicle, obtained insurance, and was in the process of obtaining an Oklahoma driver's license. The court held a hearing on June 1, 2009. Verner argued he had addressed all concerns raised in the 2008 ICPC home study and explained the living arrangements intended to accommodate his family.

¶10 Fabian-Miller opposed the motion, claiming Verner had unresolved anger issues and had had no contact with D. since the child was seven months old. She also claimed Verner had threatened to beat one of her other children when she was pregnant with D.

¶11 DSHS stated it had no basis to believe Verner was not a fit parent. But DSHS argued that without a positive ICPC home study, the court could not lawfully place D. with Verner in Oklahoma. DSHS could not say whether Fabian-Miller was likely to be successful in reuniting with her children.

¶12 The court ordered D. placed with Verner. Fabian-Miller moved to stay the order while she sought discretion-

ary review in this court. On June 5, the trial court denied the stay. D. left with Verner for Oklahoma.

¶13 We granted Fabian-Miller's request for discretionary review.

## DISCUSSION

¶14 The only issue presented by this case is whether the ICPC applies to parental placements.

¶15 Verner first argues the issue is not properly before us. He contends Fabian-Miller raised it for the first time in her motion for a stay, and that she did not designate the June 5 order in the notice of appeal.

¶16 We disagree with this reading of the record. The subject of the June 1 hearing was the impact of the Oklahoma home study on D.'s placement. Although Fabian-Miller focused on the desirability of the placement, the State argued that the negative home study precluded it. The ICPC issue was thus before the court at the June 1 hearing. Also, in Fabian-Miller's motion to stay, she argued that a positive ICPC home study is required before a court sends a child to another state. Accordingly, the June 5 hearing included an extensive discussion of the compact. Fabian-Miller's motion was in substance a motion for reconsideration, and the appeal from the June 1 order brought up for review the June 5 order as well.[4] The effect of the compact upon D.'s placement is properly before us.

### The Interstate Compact on the Placement of Children

¶17 An interstate compact is a binding legal instrument which provides for formal cooperation between states.[5] When adopted by a state, compacts are statutory

---

[4] See RAP 2.4(b), (f) (an appeal from a final judgment brings up for review the ruling of the trial court on an order deciding a timely motion for reconsideration).

[5] State v. Svenson, 104 Wn.2d 533, 538, 707 P.2d 120 (1985).

and contractual at the same time.[6] The compact does not express federal law.[7] It is thus construed as a matter of state law.[8] Given its dual nature as a statute and a contract, uniformity of interpretation is important.[9]

¶18 We review questions of statutory interpretation de novo.[10] The primary objective in construing statutes is to ascertain the intent of the legislature.[11] " '[I]f the statute's meaning is plain on its face, then the court must give effect to that plain meaning as an expression of legislative intent.' "[12] "The 'plain meaning' of a statutory provision is to be discerned from the ordinary meaning of the language at issue, as well as from the context of the statute in which that provision is found, related provisions, and the statutory scheme as a whole."[13] Legislative history, principles of statutory construction, and relevant case law may provide guidance in construing an ambiguous statute.[14]

¶19 The ICPC was drafted in the 1950s by a group of state social service administrators to address the problem of providing services to children placed across state lines.[15] Its stated purposes are to foster cooperation and information sharing among member states so as to ensure that children requiring placement "receive the maximum

---

[6] Id.

[7] McComb v. Wambaugh, 934 F.2d 474, 479 (3d Cir. 1991).

[8] Id.

[9] Id.

[10] Sleasman v. City of Lacey, 159 Wn.2d 639, 642, 151 P.3d 990 (2007).

[11] Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 813, 828 P.2d 549 (1992).

[12] State v. Jacobs, 154 Wn.2d 596, 600, 115 P.3d 281 (2005) (alteration in original) (quoting Dep't of Ecology v. Campbell & Gwinn, LLC, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002)).

[13] Id.

[14] State v. Watson, 146 Wn.2d 947, 955, 51 P.3d 66 (2002).

[15] See AM. PUB. HUMAN SERVS. ASS'N, GUIDE TO THE INTERSTATE COMPACT ON THE PLACEMENT OF CHILDREN 3 (2002), available at http://icpc.aphsa.org/Home/Doc/Guidebook_2002.pdf.

opportunity to be placed in a suitable environment and with persons or institutions having appropriate qualifications and facilities to provide a necessary and desirable degree and type of care."[16] Its provisions are to "be liberally construed to effectuate the purposes thereof."[17] The compact consists of 10 articles that define the placements it governs and the procedures to be followed, and provides for specific protections and services. It has been enacted by all 50 states, the District of Columbia, and the United States Virgin Islands.[18]

¶20 Under article III, the scope of the compact is limited to placements in foster care or as a preliminary to an adoption.[19] Article III also sets out the requirements for a valid placement. No "sending agency" (defined in article II(b) to include a court) "shall send, bring, or cause to be sent or brought into any other party state any child for placement in foster care or as a preliminary to a possible adoption" unless the sending agency complies with the ICPC,[20] which requires the sending agency to notify the receiving state of the intended placement and to provide such documents as may be necessary to carry out the ICPC's purposes.[21] The placement may not occur until the receiving state notifies the sending agency in writing that "the proposed placement does not appear to be contrary to the interests of the child."[22]

¶21 The ICPC does not define "foster care." The plain, ordinary meaning of the term is the placement of a child in a substitute home, one other than that of the child's

---

[16] RCW 26.34.010 art. I(a).

[17] *Id.* art. X.

[18] Washington enacted the ICPC in 1971.

[19] *See McComb*, 934 F.2d at 480.

[20] RCW 26.34.010 art. III(a).

[21] *See id.* art. III(b), (c).

[22] *Id.* art. III(d).

parents.[23] Under article II(d), "placement" means "the arrangement for the care of a child in a family free or boarding home or in a child-caring agency or institution . . . and any hospital or other medical facility."[24] Although "family free" or "boarding" homes are not defined, these terms clearly refer to nonparental residential arrangements that provide children with the kind of care usually received from parents.[25] Unlike a boarding home, the care provided by a family free home is free of charge.[26]

¶22 Courts across the country are divided on whether the compact applies when the out-of-state placement is to the other parent.[27] Some courts have concluded it does, in part because the definition of "placement" does not expressly exclude parents from the category of individuals who may provide care.[28] But the definition focuses not on categories of individuals but on kinds of places: family type

---

[23] *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 897 (1993); BLACK'S LAW DICTIONARY 727 (9th ed. 2009).

[24] RCW 26.34.010 art. II(d).

[25] *See In re Alexis O.*, 157 N.H. 781, 959 A.2d 176, 182 (2008); *Ariz. Dep't of Econ. Sec. v. Leonardo*, 200 Ariz. 74, 22 P.3d 513, 519 (2001).

[26] *Alexis O.*, 959 A.2d at 182.

[27] A slight majority of courts that have addressed the issue have decided that the ICPC applies to a placement with a parent so long as the child remains subject to the jurisdiction of the juvenile court. *See Green v. Div. of Family Servs.*, 864 A.2d 921 (Del. 2004); *H.P. v. Dep't of Children & Families*, 838 So. 2d 583 (Fla. Dist. Ct. App. 2003); *Leonardo*, 22 P.3d 513; *Adoption of Warren*, 44 Mass. App. Ct. 620, 693 N.E.2d 1021 (1998). Other courts have so assumed, without discussion. *See, e.g., K.D.G.L.B.P. v. Hinds County Dep't of Human Servs.*, 771 So. 2d 907 (Miss. 2000); *D.S.S. v. Clay County Dep't of Human Res.*, 755 So. 2d 584 (Ala. Civ. App. 1999); *In re Smith*, 107 Or. App. 129, 811 P.2d 145 (1991); *In re J.H.*, 156 Vt. 66, 587 A.2d 1009 (1991).

The only federal court to have addressed the issue held that the ICPC does not apply to parental placements. *See McComb*, 934 F.2d 474. The Third Circuit is joined by several state courts. *See In re Alexis O.*, 157 N.H. 781; *Ark. Dep't of Human Servs. v. Huff*, 347 Ark. 553, 65 S.W.3d 880 (2002); *N.J. Div. of Youth & Family Servs. v. K.F.*, 353 N.J. Super. 623, 803 A.2d 721 (2002); *Tara S. v. Superior Court of San Diego County*, 13 Cal. App. 4th 1834, 17 Cal. Rptr. 2d 315 (1993).

[28] *Leonardo*, 22 P.3d at 519.

homes or child care institutions versus hospitals or schools.[29]

¶23 Other courts have relied on articles VIII and X to hold that the ICPC applies to parental placements. Article X mandates that the ICPC's provisions be liberally construed to effectuate its purposes.[30] Article VIII is a limiting section. It excludes from the purview of the compact situations in which a child is sent to another state by a parent, certain relatives, or a guardian, to live with another such relative (including a parent) or a nonagency guardian.[31] Because article VIII does not mention parental placements, and because the ICPC must be construed liberally, some courts have concluded the compact applies to such placements.[32]

¶24 We disagree. First, this reasoning conflicts with the plain terms of article III, which limits the scope of the compact to foster care or preadoption placements by a "sending agency." Article VIII clarifies that the child's family or guardian is not a sending agency. It is thus designed to limit the scope of the compact. The fact it does not identify every situation not qualifying as foster care cannot reasonably be interpreted to expand the compact.

¶25 Under article V, the sending state retains jurisdiction over the child as if "the child had remained in [that] state," and the sending agency has continuing financial responsibility for the child's support and maintenance.[33] As the Third Circuit observed, to construe placement of a child with his parent as a placement in foster care under the ICPC "would result in the anomalous situation of imposing

---

[29] *McComb*, 934 F.2d at 480.

[30] RCW 26.34.010 art. X.

[31] *Id.* art. VIII(a).

[32] *See Dep't of Children & Families v. Benway*, 745 So. 2d 437, 438-39 (Fla. Dist. Ct. App. 1999).

[33] RCW 26.34.010 art. V(a).

a financial obligation upon a sending state that supersedes parents' duty to support their children."[34]

¶26 We are persuaded that the ICPC governs only the placement of children in substitute arrangements for parental care.

## The Association of Administrators Regulations

¶27 The Association of Administrators of the Interstate Compact on the Placement of Children (AAICPC) are officials designated by each member state to coordinate ICPC matters within that state.[35] Acting jointly, the administrators "shall have the power to promulgate rules and regulations to carry out more effectively the terms and provisions of this compact."[36] The AAICPC has issued a regulation providing that the ICPC applies, with some limited exceptions, to parental placements. Fabian-Miller and DSHS urge us to defer to the regulation.

¶28 Regulation 3 is titled "Placements with Parents, Relatives, Non-agency Guardians, and Non-family Settings."[37] Under the regulation, placement "includes the arrangement for the care of a child in the home of his parent . . . when the sending agency is any entity other than a parent,"[38] foster care includes circumstances where the "24-hour a day care is provided by the child's parent(s) by reason of a court-ordered placement (and not by virtue of the parent-child relationship),"[39] and the ICPC does not apply "whenever a court transfers the child to a non-custodial parent with respect to whom the court does not

---

[34] *McComb*, 934 F.2d at 480.

[35] *See* RCW 26.34.010 art. VII.

[36] *Id.*

[37] Ass'n of Adm'rs of the Interstate Compact on the Placement of Children, ICPC Regulations regulation 3 (effective July 2, 2001), *available at* http://icpc.aphsa.org/Home/regulations.asp.

[38] *Id.* regulation 3(1).

[39] *Id.* regulation 3(5).

have evidence before it that such parent is unfit, does not seek such evidence, and does not retain jurisdiction over the child after the court transfers the child."[40]

¶29 The AAICPC regulations have not been adopted in Washington[41] and therefore have no binding effect. In any event, regulation 3 cannot control because it impermissibly expands the scope of the ICPC beyond that established in article III. Under article III, the compact applies to foster care or placements preliminary to possible adoption, neither of which is a parental placement.

¶30 Courts that have applied regulation 3 have often emphasized the desirability of applying the ICPC to parental placements. One court explained that regulation 3 recognizes that a noncustodial parent may have had no involvement in the child's care before the child is removed from the care of the other parent, leaving a question as to the noncustodial parent's fitness, and "many of the same concerns that must be addressed before out-of-state placement with a 'substitute' or foster parent, are also present with a non-custodial natural parent."[42]

¶31 These are valid concerns. In making placement decisions, the court's paramount duty is to protect the best interests of the child.[43] Placement with an unfit parent is obviously not in a child's best interests, and courts can and should demand information about the absent parent's fitness. However, courts, not administrative agencies or individual social workers, are the ultimate evaluators of a parent's ability to care for his child, and the

---

[40] *Id.* regulation 3(6)(b).

[41] *Compare* RCW 26.34.010 art. VII (providing that compact administrators have "the power to promulgate rules and regulations to carry out more effectively the terms and provisions of [the ICPC]"), *with* RCW 13.24.011 art. IV(2) (providing that the interstate commission for juveniles has the power to "[a]dopt rules to effect the purposes and obligations of [the interstate compact on juveniles] which shall have the force and effect of statutory law and shall be binding in the compacting states to the extent and in the manner provided in this compact").

[42] *Green v. Div. of Family Servs.*, 864 A.2d 921, 928 (Del. 2004).

[43] *In re Dependency of J.B.S.*, 123 Wn.2d 1, 8-9, 863 P.2d 1344 (1993).

ultimate decision makers as to whether placement with a fit parent is in the child's best interests. Yet under regulation 3, when a fit parent is available but an ICPC home study is negative, all discretion is transferred to an administrative agency in the sister state. If the court determines the parent is fit, the ICPC may become an obstacle to the court's ability to act in the best interests of the child.

¶32 This case is an excellent example. A thoughtful and well-informed trial judge searched out the best interests of a child who, fortunately, has a fit parent anxious to offer him a home. DSHS has consistently assessed Verner to be a fit parent, and he steadfastly addressed the concerns of the Oklahoma social worker. By the time of the final study, the social worker's only complaint was that Verner's house had too few bedrooms. Washington has no such policy, and the court was satisfied with the proposed living arrangements. But DSHS insists the judge was bound to decide against the placement.

¶33 This is nonsense. The number of bedrooms a family enjoys is a direct consequence of its financial circumstances. Many children have been happily raised without bedrooms of their own. Other children have bedrooms, while a parent sleeps on the sofa. It is the parenting relationship, not the square footage, that interests the court, because it is the parenting relationship that matters to the child. What the evidence shows is that Verner is a fit parent able to provide a good home for D. That was what the court considered, and we believe the court made the right decision.

¶34 We agree with the Third Circuit[44] that regulation 3 impermissibly expands the scope of the compact beyond that set out in article III.[45] The ICPC does not require sister state

---

[44] *McComb*, 934 F.2d at 481.

[45] An administrative rule has the force of law only if the agency promulgated it with delegated authority. *Campbell v. Dep't of Soc. & Health Servs.*, 150 Wn.2d 881, 892, 83 P.3d 999 (2004). "[A]n agency does not have the power to promulgate rules that amend or change legislative enactments" but it may " 'fill in the gaps' in legislation" where necessary to effectuate a general statutory scheme. *Green River Cmty. Coll. v. Higher Educ. Pers. Bd.*, 95 Wn.2d 108, 112, 622 P.2d 826 (1980)

approval of parental placements.[46] The court acted within its discretion in placing D. with his father in Oklahoma.

¶35 Affirmed.

DWYER, C.J., and LAU, J., concur.

Review denied at 170 Wn.2d 1026 (2011).

---

(internal quotation marks omitted) (quoting *Hama Hama Co. v. Shorelines Hearings Bd.*, 85 Wn.2d 441, 448, 536 P.2d 157 (1975)), *amended on reh'g*, 95 Wn.2d 962, 633 P.2d 1324 (1981).

[46] Given our disposition, we do not address Verner's argument that if the ICPC applies to parental placements, it violates due process.