IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In re the Welfare of: | ) | No. 32765-5-III cons. w/ |
| | ) | No. 32776-1-III; No. 32777-9-III |
| Ca.R., | ) | |
| Cl.R., | ) | |
| G.R., | ) | |
| | ) | |
| | ) | PUBLISHED OPINION |
| Minor(s). | ) | |

BROWN, J. — Tabitha Thomas appeals a superior court judge's denial of her request to revise a commissioner's ruling granting the Department of Social and Health Services' (Department's) dependency petition for her daughters, Ca.R., Cl.R., and G.R. Ms. Thomas contends the court erred in finding she was not capable of adequately caring for the girls, ordering out-of-home placement, and ordering an Interstate Compact on the Placement of Children investigation (ICPC) with Nevada before the children's placement with her. We find no abuse of trial court discretion in the trial court's dependency and placement decisions. We lack a record of Nevada's ICPC involvement. Thus, Ms. Thomas' ICPC concerns are both premature and ungrounded. Accordingly, we affirm.

No. 32765-5-III cons. w/ 32776-1-III and 32777-9-III
*In re the Welfare of Ca.R., CI.R., and G.R.*

FACTS

In 2011, the State of Nevada removed Ca.R. (born 1/19/02), CI.R. (born 1/17/05), and G.R. (born 10/7/06) from Ms. Thomas' care along with a younger stepbrother, A.G., who is not the subject of this appeal. Nevada then petitioned for dependency based on Ca.R.'s allegations of sexual abuse by her mother's boyfriend, A.G.'s father; domestic violence; and Ms. Thomas' drug use. Later, the three girls were placed with their father in Oregon after an approved ICPC. The Nevada dependency was then dismissed as to the girls. The girls moved to Spokane with their father in the summer of 2013.

In January 2014, Ca.R. alleged her father sexually abused her and the Department petitioned for dependency. Ms. Thomas appeared through counsel. The girls had not seen Ms. Thomas since leaving Nevada, but had frequent telephone conversations with her. On March 26, 2014, the girls' father agreed to dependency. Ms. Thomas participated telephonically in a family team decision meeting, unsuccessfully requesting placement of the girls with her in Nevada as soon as possible, without having to wait for the results of an ICPC request.

A fact-finding hearing was held in May. Ca.R. was then in her second placement, while CI.R. and G.R. were still together in their first placement. The Department moved Ca.R. to a receiving home from her first placement because she had displayed disruptive behavior, including head banging and excessive attention-seeking behavior and over-attachment to people. Ca.R. reports she is very angry and has nightmares. Evidence showed Ms. Thomas suffers from post-traumatic stress

2

disorder and panic disorder with agoraphobia. G.R. and Cl.R. struggle with being overly afraid of bugs, the outdoors, and trees. Ms. Thomas related she lives with her significant other, Anton Ort, and her two sons, A.G., and Z.O.

After fact-finding, the commissioner entered findings of fact noting the amount of work Ms. Thomas had done to have her younger boys returned to her care, but found, "The court is concerned that the services provided during mother's dependency in Nevada were not directed at reunifying her with [Ca.R., Cl.R., and G.R.]." Clerk's Papers (CP) at 85. Specifically, the commissioner found, "The trauma that the children experienced in the mother's home (mother's substance abuse and domestic violence as well as [Ca.R.'s] disclosure of sexual abuse by mother's former partner) has not been addressed." *Id.* Further, "[Ca.R.] has significant behavioral and emotional issues. She is just now beginning to deal with these issues in counseling. Her behavior appears to be parentified. If she were to be placed with her mother today she would suddenly have new siblings and a new father figure as well as re-adjusting to living with her mother. This could set the family up for failure." CP at 86. The commissioner found, "An ICPC approval is needed so that the State of Nevada will provide oversight of the family if [Ca.R.] is placed in the home." CP at 86 (Finding of Fact i).

The commissioner granted the, dependency petition, ruling "Ms. Thomas is currently not capable of parenting [Ca.R., Cl.R. or G.R.] due to the unresolved issues that led to the dependency in Nevada. Specifically, Ms. Thomas needs to repair her relationship with the girls, and to demonstrate that she can attend to their emotional

3

needs including participating in any family counseling or other therapy needed. Mother also needs to continue her commitment to sobriety." CP at 86.

The commissioner then found "an ICPC approval is needed so that the State of Nevada will provide oversight of the family if [Ca.R.] is placed in the home." CP at 86. The commissioner noted in her oral ruling she wanted "the ICPC . . . process to get started, not because it's required for a parent but because of the additional oversight and it's clear that you have a very good relationship with your social worker and they may be happy to supervise and give us the oversight there that we need." CP at 327.

Ms. Thomas moved to revise the commissioner's order, arguing she could provide counseling for the girls in Nevada through state agencies and insisting she was capable of caring for all five children. The court denied her revisions request, adopting the commissioner's findings of fact, and finding the dependency was based on "the children's needs, to ensure their safety and that a move to their mother's home would be done in an appropriate manner that meets their needs." CP at 385. The court found, "It will be helpful to this family to have a social worker in Nevada, assigned through the ICPC process, who will help to provide services and supports in reintroducing these children to their mother's home." CP at 385. Ms. Thomas appealed.

ANALYSIS

A. Dependency Finding

The issue is whether the revision judge erred by abusing her discretion when denying revision of the commissioner's dependency finding. Ms. Thomas contends

4

substantial evidence does not support the court's finding she is not capable of parenting Ca.R., Cl.R., and G.R.

"We review the superior court's ruling, not the commissioner's." *State v. Ramer*, 151 Wn.2d 106, 113, 86 P.3d 132 (2004). "Commissioner rulings are subject to revision by the superior court." RCW 2.24.050. On revision, the superior court reviews the commissioner's findings of fact and conclusions of law de novo based on the evidence and issues presented to the commissioner. *In re Marriage of Moody*, 137 Wn.2d 979, 992-93, 976 P.2d 1240 (1999). We review a superior court's dependency placement decision for abuse of discretion. *In re Dependency of A.C.*, 74 Wn. App. 271, 275, 873 P.2d 535 (1994). A court abuses its discretion when it "applies the wrong legal standard, or bases its ruling on an erroneous view of the law." *Gildon v. Simon Prop. Grp., Inc.*, 158 Wn.2d 483, 494, 145 P.3d 1196 (2006).

Parents' "have a fundamental liberty interest in the care and welfare of their minor children" must be balanced with the State's "interest in protecting the physical, mental, and emotional health of children." *In re Dependency of Schermer*, 161 Wn.2d 927, 941, 169 P.3d 452 (2007). Unless a child's right to nurture, physical and/or mental health, or safety is endangered, "the family unit should remain intact." RCW 13.34.020. But when the rights of the child and the legal rights of the parents conflict, the child's rights prevail, as the child's health and safety [are] the paramount concern. *Id.* Declaring a child "dependent" transfers legal custody to the State. *Schermer*, 161 Wn.2d at 942. After filing a dependency petition, a fact-finding hearing is held to decide

if the allegations are true. *Id.* The petitioner must show "by a preponderance of the evidence that the child meets one of the statutory definitions of dependency." *Id.*

Relevant here, Washington defines a "dependent child" as a child who "has no parent . . . capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development." RCW 13.34.030(6)(c). Dependencies based on RCW 13.34.030(6)(c) do not require a finding of parental unfitness; instead, they "allow[ ] consideration of both a child's special needs and any limitations or other circumstances which affect a parent's ability to respond to those needs." *Schermer*, 161 Wn.2d at 944. A child is not dependent if a capable parent exists. *In re Walker*, 43 Wn.2d 710, 715, 263 P.2d 956 (1953).

When evaluating evidence to determine whether a child is dependent, trial courts have broad discretion and considerable flexibility to reach "'a decision that recognizes both the welfare of the child and parental rights.'" *Schermer*, 161 Wn.2d at 952 (quoting *In re Welfare of Becker*, 87 Wn.2d 470, 478, 553 P.2d 1339 (1976)). A court has no required factors to consider. *Becker*, 87 Wn.2d at 477 (interpreting predecessor statute). Decisions to dismiss a dependency cannot "be based upon hunches or snap judgments": all parties have a right to be heard, and children need a well-considered decision. *In re Dependency of R.H.*, 129 Wn. App. 83, 88, 117 P.3d 1179 (2005).

Our "appellate review is limited to whether substantial evidence supports the trial court's findings and whether the findings support its conclusions of law." *Schermer*, 161

6

Wn.2d at 940. "Substantial evidence exists if, when viewing the evidence in the light most favorable to the prevailing party, a rational trier of fact could find the fact more likely than not to be true." *In re Welfare of X.T.*, 174 Wn. App. 733, 737, 300 P.3d 824 (2013). Furthermore, we do not reweigh evidence or reassess witness credibility. *Id.*

Here, the girls had not seen their mother since they were removed from her Nevada home three years earlier. They were removed based on allegations of sexual and physical abuse, substance abuse, and exposure to domestic violence. A dependency was started but dismissed without services to address the removal problems because the girls relocated to their father's home in Oregon. The girls now show concerning behaviors such as head banging, unhealthy attachments, unfounded fears, anger, and nightmares. Nothing in this record indicates Ms. Thomas understands what the girls would need from her to address the girls' difficult behaviors. Moreover, no plan is in place for preventing interaction between A.G.'s father and the girls in Nevada. Sending the girls to live with Ms. Thomas without an investigation and services in place would subject them to extraordinary risk of additional trauma due to a lack of emotional and behavioral support, as well as exposure to a former abuser. Ms. Thomas argues services are available through a program she is currently involved in, but further investigation is needed to make sure the girls qualify for these services and that the services are tailored to their, and Ms. Thomas's, specific needs.

Ms. Thomas next incorrectly argues the court was required to find her unfit. The Department need not prove a parent is unfit to prove a dependency. *Schermer*, 161

7

Wn.2d at 944. A dependency based on RCW 13.34.030(6)(c) does not turn on parental "unfitness" but allows consideration of both a child's special needs and any limitations or other circumstances which affect a parent's ability to respond to those needs. *Id.*

This case, like the *Schermer* case involves special needs and circumstances. The girls have not lived with their mother since 2011 when they were removed from her home and dependency proceedings started. No services were offered because the girls relocated to Oregon to live with their father. The girls have been exposed to physical, sexual, and substance abuse resulting in their present concerning behaviors. Here, it is sufficient for the Department to prove Ms. Thomas is not capable of adequately caring for Ca.R., Cl.R., and G.R., based on their special needs and the case circumstances. The Department has met this burden. Placing the girls with Ms. Thomas would put the children in circumstances which constitute a danger of substantial damage to their psychological or physical development; thus, satisfying RCW 13.34.030(6)(c). Given all, we conclude the court did not abuse its discretion in finding the girls dependent.

## ANALYSIS

### B. Placement and ICPC Involvement

Based on her rejected adequate-parent arguments, Ms. Thomas contends the trial court erred in not placing the children with her. Thus, she incorrectly argues ICPC involvement is an unnecessary delay to placing the girls with her.

Dependency hearings determine what course of action serves the child's best interests. *Schermer*, 161 Wn.2d at 942. In dependency proceedings, discretionary

8

placement decisions are reviewed for an abuse of discretion. *In re Dependency of A.C.*, 74 Wn. App. 271, 276, 873 P.2d 535 (1994). "A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds." *In re Marriage of Kovacs*, 121 Wn.2d 795, 801, 854 P.2d 629 (1993).

When placing a child, "the best interests of the child are the court's paramount concern." *In re Dependency of R.W.*, 143 Wn. App. 219, 223, 177 P.3d 186 (2008). Because each case is fact specific, no exact criteria exists for determining what the child's best interests are. *Id.* Even though a child's interests are the paramount concern, the parents' interests still have weight: courts are directed "to adopt a program which will 'least interfere with family autonomy, provided that the services are adequate to protect the child.'" *In re Dependency of J.B.S.*, 123 Wn.2d 1, 12, 863 P.2d 1344 (1993) (quoting RCW 13.34.130(1)(a)). But, if it is not in the child's best interests, a court is not required to reunite children with the parent who had custody at the time of the dependency action. *R.W.*, 143 Wn. App. at 223.

The girls were not living with Ms. Thomas when the Washington dependency proceedings were initiated and had been previously removed from Ms. Thomas' Nevada home for dependency proceedings. Nothing shows the girls' special needs were remedied when they were sent to Oregon to live with their father. These facts provide tenable grounds for the court to deny in-home placement.

Ms. Thomas incorrectly argues the court erred by mandating ICPC proceedings before making a placement determination. The superior court judge adopted the

9

commissioner's findings of fact. Finding of fact i states, "An ICPC approval is needed so that the State of Nevada will provide oversight of the family if [Ca.R.] is placed in the home." CP at 86. The word "needed" is not used to connote a prerequisite.

"The ICPC was drafted in the 1950s by a group of state social service administrators to address the problem of providing services to children placed across state lines." *In re Dependency of D.F.-M.*, 157 Wn. App. 179, 187, 236 P.3d 961 (2010). Its purpose is to encourage cooperation and information sharing among member states. *Id.* It is a tool for foster care placement or preliminary to an adoption. *Id.* at 188. Division One of this court held, "the ICPC governs only the placement of children in substitute arrangements for parental care." *Id.* at 191. The ICPC process does not govern placement of children with parents. Placement decisions are made by the courts. Our record does not disclose what, if any, response Nevada has made to Washington's ICPC request. Thus, Ms. Thomas' ICPC concerns are premature. Our case is unlike *D.F.-M.* where the court dealt with an Oklahoma ICPC process that interfered with Washington's placement decision. Here the goal remains to investigate placement of the girls with Ms. Thomas with Nevada's ICPC assistance.

In sum, the commissioner correctly noted the ICPC process was "not . . . required for a parent." CP at 327. But this does not eliminate cooperation between the two states as the parties work toward reunification. Rather, consistent with *D.F.-M.*, it leaves the decision of whether Ms. Thomas is capable of parenting the girls within the

10

No. 32765-5-III cons. w/ 32776-1-III and 32777-9-III
*In re the Welfare of Ca.R., Cl.R., and G.R.*

sound discretion of the trial court rather than an administrative agency.  *See D.F.-M.*,

157 Wn. App. at 192.

Affirmed.

Brown, J.

Brown, J.

I CONCUR:

Siddoway, C.J.

No. 32765-5-III; consolidated with 32776-1-III; 32777-9-III

FEARING, J. — (dissent) This appeal arises from consolidated dependency petitions involving eight children all related by blood or cohabitation. The appeal concerns three of the children identified in the majority opinion as Ca.R., born January 19, 2002; Cl.R., born January 17, 2005; and G.R., born October 7, 2006. For ease in reading, I refer to the three girls respectively and fictitiously as Karen, now age thirteen, Cathy, now age ten, and Georgia, now age nine. The three girls are sisters and the biological daughters of appellant Tabitha Thomas, who resides in Las Vegas. Wesley Rees is the biological father of Karen and Georgia and listed on the birth certificate of Cathy as Cathy's father, although another gentleman is the biological father. The parties consider Wesley Rees as the father of all three girls.

In January 2014, when the State of Washington intervened in the lives of Karen, Cathy, and Georgia, the three lived with their father Wesley Rees and his girlfriend, Alicia Huante, in Spokane. Huante bore other children, who resided in the household, including male twins born in December 2012. Rees is the father of the twins. The State removed Karen, Cathy and Georgia from their Spokane home because of allegations of

sexual abuse by Wesley Rees. The State of Washington also removed from the household the twins and three Greenleaf children, two girls and one boy, whose mother is Alicia Huante.

The trial court declared Karen, Cathy and Georgia dependents of the State of Washington based on a conclusion that neither Tabitha Thomas nor Wesley Rees are capable of parenting the three within the meaning of RCW 13.34.030(6)(c). The statute allows a dependency when no parent is capable of adequately caring for a child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development. The trial court did not find that Tabitha Thomas' care for any of the three daughters would constitute a danger of substantial damage and the evidence would not support such a finding. The State would not return the two younger girls to Thomas because the girls have a fear of the outdoors, bugs, and trees. Thomas appeals the dependency ruling and argues that substantial evidence does not support the dependency finding. I agree. I would reverse the trial court and dismiss the dependency petition.

The trial court ordered a placement study by Nevada authorities, under the "Interstate Compact on Placement of Children" (ICPC) ch. 26.34 RCW. In addition to determining whether to uphold the dependency, this court must also decide whether the trial court had authority to order such a study. It did not.

2

FACTS

The case's facts derive from a one-day dependency trial before a court commissioner. During the trial, the State's sole witness, social worker Amanda Plumb, testified to the background of Tabitha Thomas. Plumb's basis of knowledge for the background was Nevada Child Protective Service (CPS) binders, but the State did not seek to introduce the records in the binders as an exhibit. During her testimony, Plumb did not refer to the records to confirm she testified consistently with the records. Plumb never met Thomas and thus never observed her with children. Plumb only knew Thomas from what Plumb read, including recent Nevada reports that establish that Thomas performs well as a mother.

Tabitha Thomas is the mother of seven children, three of whom are the subject of this appeal. In addition to Karen, Cathy, and Georgia, Thomas bore Faith, a daughter older than the three girls, Terrance, who resides on an Indian reservation in North Dakota, Andrew, born in 2011, and Zeke, born in 2013. Andrew and Zeke are also ersatz monikers. The ages of Faith and Terrance are unknown.

Physicians have diagnosed Tabitha Thomas with posttraumatic stress disorder, panic disorder, and agoraphobia. She has suffered domestic violence. Thomas now receives counseling for her mental health disorders.

3

At trial, Amanda Plumb averred that a report in the binder commented that Faith tried to drown a seven year old. According to one report, both Faith and Tabitha Thomas bang each's respective head against a wall.

Karen, Cathy and Georgia lived with their mother Tabitha Thomas in Nevada until 2011. We do not know when Thomas and Wesley Rees, the father of the three girls, separated. In 2011, the State of Nevada removed Karen, Cathy, Georgia, and younger brother Andrew from Thomas' home in Las Vegas. Nevada filed a dependency and alleged sexual abuse of Karen by Thomas' former boyfriend and Andrew's father, Mark Gregory, domestic violence against Thomas by Gregory, and Thomas' drug use. Authorities later determined that Karen fabricated the allegation of sexual abuse by Gregory.

Upon removal from their mother's Nevada home, Karen, Cathy, and Georgia lived with their father, Wesley Rees, in Oregon. The State of Nevada then dismissed the dependency proceeding with regard to the three girls. In 2013, the sisters moved to Spokane with their father and his companion, Alicia Huante.

Amanda Plumb testified that children of Tabitha Thomas have been "removed, returned, removed, and returned" by Nevada on multiple occasions, beginning in 2000. Clerk's Papers (CP) at 162. Plumb gave scant details. As already written, the State of Nevada removed Andrew, along with the three girls, in 2011. Nevada returned Andrew to Thomas sometime in 2011. Nevada removed Andrew again on February 22, 2013.

4

Tabitha Thomas has not had physical contact with Karen, Cathy and Georgia since their removal from her Nevada home in 2011. Since removal, Thomas has regularly spoken on the telephone with all three daughters, particularly with the oldest daughter, Karen. She speaks with Karen at length every evening for up to an hour. She helps Karen with homework. The mother and daughter discuss school, grades, attitudinal problems, positive ideals, and helping around the house. Karen initially expressed frustration to Thomas about mistakes Thomas made in the latter's life. According to Thomas, Karen has forgiven her, in part, because Thomas unfailingly calls Karen and speaks consistently.

Tabitha Thomas respectively speaks with Cathy and Georgia about once a week for five minutes to a half hour. Thomas speaks to the younger girls about school and favorite things. The foster mother of Cathy and Georgia taught them songs to sing to their mother because they initially lacked subjects to discuss.

As a result of the 2011 Nevada dependency proceeding, Tabitha Thomas underwent intensive outpatient drug treatment for six months. Since April 2012, Thomas has successfully completed random and frequent urinalyses. Thomas also underwent domestic violence counseling for one year and still engages in mental health counseling. She took a parenting class.

Upon the May 2013 birth of Zeke, Tabitha Thomas remained under the specter of a Nevada dependency, so the State assigned Zeke to reside with his father, Anton Ort.

Ort has no CPS history. Ort and Thomas now cohabit, and Nevada returned Andrew to Thomas on July 1, 2013. Anton Ort helps raise both boys. Ort and Thomas plan to marry.

Anton Ort, Tabitha Thomas, Andrew, and Zeke live in a three bedroom, two bathroom apartment obtained for them by Las Vegas' Women's Development Center. Random urinalyses is a prerequisite to occupancy in the apartment complex. Women's Development Center could establish family counseling for Thomas and her three daughters. Thomas has a support system through her church, Victory Outreach, and through other families she met. A YMCA, providing recreation for the children, is a five minute walk.

In January 2014, Karen Rees and one of the Greenleaf daughters respectively alleged that Wesley Rees sexually abused her. Spokane authorities currently investigate the allegations, but the State has filed no criminal charges against Rees. Since some of the purported abuse of Karen allegedly occurred in Oregon, Oregon authorities also currently investigate the charges. As of the May 2014 trial in this dependency proceeding, Karen lived in Spokane's Sally's Home and Cathy and Georgia resided together in foster care.

Amanda Plumb, the State social worker, testified at trial that Karen, Cathy, and Georgia currently fare well. The three encounter no medical problems. According to Plumb, Karen Rees is a very sweet, happy, and bright girl, who has overcome adversity.

6

Cathy and Georgia are also happy, and they perform well academically and developmentally.

According to Amanda Plumb, Karen, despite her happiness, exhibits behavioral issues. Plumb opined that Karen "may" have reactive attachment disorder in that she attaches quickly to others. Karen occasionally expresses rage, and she bangs her head against the wall. Plumb declared that Karen needs constant attention.

Amanda Plumb testified that Karen reports nightmares. Karen fears that her father will kidnap and punish her for reporting sexual abuse. She is anxious when she rides on the Spokane street where she lived with her father and Alicia Huante. Plumb hinted that Karen suffers from posttraumatic stress disorder, but Plumb did not provide any background to qualify her for diagnosing the disorder. Plumb declared that a caretaker of Cathy and Georgia reported that both lasses are afraid of "everything, bugs, outdoors, trees, everything." CP at 169.

Amanda Plumb testified that Tabitha Thomas has not agreed to engage in any services with the State. Plumb did not identify what, if any, services the State offered to Thomas. Thomas called Plumb to inform her that Karen's glasses broke. Thomas advocated for new glasses for her daughter.

During trial, Amanda Plumb recommended denial of placement at this time of Karen, Cathy and Georgia with Tabitha Thomas. Plumb opined that raising older girls differs from raising one and three year old boys. According to Plumb, the girls were

7

repeatedly traumatized in Thomas' care. Plumb did not provide details of any of the purported trauma. Remember that Nevada authorities concluded that Karen had not been sexually abused.

Amanda Plumb testified that the Rees daughters reported to her fear of Mark Gregory, the purported sexual abuser of Karen. Plumb provided no testimony that Mark would have contact with the girls if placed with Tabitha Thomas. Plumb declared: "from what I've gathered [Andrew] has visits with him [Mark.]" CP at 165.

Amanda Plumb conveyed concern about Tabitha Thomas' ability to care for Karen when Karen exhibits difficult behavior. Plumb declared:

> my concern is does Tabitha right now, currently have the ability and is she suited to take care of those behaviors. I'm not saying she can't but I wanna make sure before we just place [Karen] who has been traumatized by several different people back into a situation into the same city. . . . What's, what how is that PTSD gonna manifest in Tabitha's home and is Tabitha equipped to handle that.

CP at 169. Plumb wants "to make absolute sure with an ICPC [study] that these children are gonna be moving back to a safe environment." CP at 213.

Amanda Plumb expressed concern to the trial court that placement of Karen, Cathy and Georgia with Tabitha Thomas would more than double Thomas' household. Plumb has not seen the facility in which Thomas resides. Plumb expressed concern about Thomas relapsing into drug use. Plumb desires Thomas to undergo training geared toward parenting children with behavioral issues and to engage in family therapy with the

8

daughters.

Amanda Plumb recognized Tabitha Thomas' recent improvements in parenting skills and the potential of returning the three daughters to Thomas. Nevertheless, Plumb wished Nevada to perform an ICPC placement study and the family to engage in counseling before a return.

During her trial testimony on the telephone from Las Vegas, Tabitha Thomas pledged to care for her two young boys and her three daughters. She does not work outside the home. Her fiancé, Anton Ort, remains available to assist. Thomas noted that all but one of the children is of school age, so she will receive daily breaks. Thomas wishes to engage the children in church activities.

Tabitha Thomas recognizes now that she earlier chose abusive partners, took controlled substances, and placed her children in unsafe situations. She testified she will not repeat these errors because of her support system, her drug treatment, and ongoing counseling. Thomas is pleased with her life during the last two years.

The State ignores trial testimony from Melissa Blodgett, a family services specialist with the Department of Family Services in Clark County, Nevada. Blodgett serves as a caseworker who works with parents and children involved with CPS. She has a bachelor's degree in human resources management and intensive training with the Department of Family Services. Blodgett served as Tabitha Thomas' case worker from August 2013 until January 2014, when Nevada dismissed the dependency action

concerning Andrew. Upon assuming duties with Thomas, Melissa Blodgett reviewed Thomas' Nevada case file. The file did not confirm a chronic history of drug abuse or neglect of children claimed by the State of Washington.

According to Melissa Blodgett, Tabitha Thomas completed intensive outpatient therapy services. She also completed parenting and domestic violence counseling. Thomas passed urinalyses during the entire dependency proceeding.

Melissa Blodgett observed Tabitha Thomas during ten to twelve visits with her two young boys. Thomas performed well as an attentive parent. Nevada returned the children to Thomas because of Thomas' performance and at the recommendation of service providers and experts, including drug and alcohol treatment experts.

Melissa Blodgett testified that Tabitha Thomas' son Andrew has special needs and receives speech therapy. Thomas diligently safeguards the therapy, and Andrew has progressed far with his speech development. Despite the dependency ending, Blodgett saw Andrew in April 2014, and Blodgett understood each word uttered by the boy. Andrew's mental and physical development has progressed well.

According to Melissa Blodgett, Anton Ort, who lives with Tabitha Thomas and the two young boys, has no CPS history. The State of Nevada kept Zeke with Ort, upon Zeke's birth, despite the dependency pending with Thomas. Ort performed well as Zeke's father. He could assist in parenting Karen, Cathy, and Georgia. Blodgett supports

10

all five children living in Tabitha Thomas' current physical residence. The home has three bedrooms and adequate space for the children. The home is fully furnished.

According to Melissa Blodgett, Las Vegas' Women's Development Center continues to provide services to Tabitha Thomas. The center assisted Thomas obtain the housing, referred her to counseling, and assists her in safety planning, money management, and daily living skills.

Melissa Blodgett observed that Tabitha Thomas is motivated to be a parent and is capable of caring for more than the two boys. Blodgett holds that Thomas could care for older children. Thomas has shown exemplary parenting skills for her two sons. The two boys are well loved and cared for. Thomas has a clear understanding of appropriate parenting and demonstrates it through her behavior and interactions with her children. She continues to engage in counseling and mental health services. Blodgett exudes confidence in Thomas despite Blodgett's knowledge of Thomas' CPS history. Blodgett credits the intensive outpatient substance abuse treatment as changing Thomas.

Melissa Blodgett testified that, if Tabitha Thomas needed assistance, she knows where to obtain help. Thomas has been proactive in obtaining assistance for Andrew. Thomas remains in contact with Blodgett, despite no requirement of contact. Thomas continues to ask Blodgett for advice and updates Blodgett on the condition of the Thomas' two young boys.

PROCEEDING

The State of Washington petitioned for a dependency of Karen, Cathy and Georgia Rees, among others. Wesley Rees agreed to the dependency with regard to his five children that are the subject of the petition. Tabitha Thomas requested that her three daughters be returned to her in Nevada.

After a one-day trial, the court commissioner refused to return Karen, Cathy, and Georgia to Tabitha Thomas. The commissioner concluded that all three daughters are dependent within the meaning of RCW 13.34.030(6)(c).

The court commissioner entered the following findings of fact:

> a. Ms. Thomas has done an extraordinary amount of work during her dependency in Nevada to obtain the return of two of her children, [Zeke] Orton, age 1, and [Andrew] Gregory, age 3. She successfully completed the following services: Intensive outpatient treatment, domestic violence counselling, mental health counselling, parenting classes, and providing clean UAs. Ms. Thomas has maintained stable housing and has regular contact with her previously assigned social worker, Melissa Blodgett. Prior to the Nevada Dependency, she had a significant history of concerning behavior, including substance abuse and making poor choices in relationships.
> . . . .
> c. The children have experienced traumatic situations while placed with their father. [Karen] has disclosed that she has suffered sexual abuse by her father.
> d. The court is concerned that the services provided during mother's dependency in Nevada were not directed at reunifying her with [Karen, Cathy, and Georgia] because they were already placed with their father. Instead, the services were focused on returning the children's half siblings.
> e. The trauma that the children experienced in the mother's home (mother's substance abuse and domestic violence as well as [Karen's] disclosure of sexual abuse by mother's former partner) has not been

12

addressed. The allegations of sexual abuse were investigated and did not result in a founded finding by Nevada CPS. Service of counseling will address this concern.

f. [Karen] has significant behavioral and emotional issues. She is just now beginning to deal with these issues in counseling. Her behavior appears to be parentified. If she were to be placed with her mother today she would suddenly have new siblings and a new father figure as well as re-adjusting to living with her mother. This could set the family up for failure. This case needs to progress slowly enough that it won't disrupt the family.

g. [Karen] needs individual and family counseling to process what she has been through.

. . . .

i. An ICPC approval is needed so that the State of Nevada will provide oversight of the family if [Karen] is placed in the home.

j. The court finds that a "C" [RCW 13.34.030(b)(c)] dependency has been established by a preponderance of the evidence. Ms. Thomas is currently not capable of parenting [Karen, Cathy, or Georgia] due to the unresolved issues that led to the dependency in Nevada. Specifically, Ms. Thomas needs to repair her relationship with the girls, and to demonstrate that she can attend to their emotional needs including participating in any family counsel[ ]ing or other therapy needed. **Mother also needs to continue her commitment to sobriety**.

CP at 393-94.

RCW 13.34.030(6)(c) requires a finding, before entry of a dependency, that the inability of the parent to care for the child creates circumstances which constitute a danger of substantial damage to the child's psychological or physical development. The court commissioner entered no finding of fact or conclusion of law that placement of any or all of the three daughters with Tabitha Thomas would create a danger of substantial harm.

Tabitha Thomas asked a superior court judge to revise the commissioner's order.

13

The court denied her revision request. The court adopted the commissioner's findings of fact and added the following finding:

> 2. A dependency is an appropriate vehicle to provide a family with services do [to] remedy issues in the parent/child relationship and to ensure a smooth transition when adding three additional children to the home. The finding of dependency was based upon the children's needs, to ensure their safety and that a move to their mother's home would be done in an appropriate manner that meets their needs. It will be helpful to this family to have a social worker in Nevada, assigned through the ICPC process, who will help to provide services and supports in reintroducing these children to their mother's home.

CP at 385.

## LEGAL ANALYSIS

### Dependency Sufficiency of Evidence

Tabitha Thomas argues a lack of evidence supports the declaration of her children as State dependents. RCW 13.34.030(6) lists four conditions under which a court may declare a child a dependent of the State of Washington. To declare a child dependent, the trial court must find by a preponderance of evidence that the child meets one of the statutory definitions. *In re Welfare of Key*, 119 Wn.2d 600, 612, 836 P.2d 200 (1992); *In re Dependency of C.M.*, 118 Wn. App. 643, 648, 78 P.3d 191 (2003). The State relies on the definition found in RCW 13.34.030(6)(c).

RCW 13.34.030(6)(c) defines "Dependent child," in part, as any child who:

> (c) Has no parent, guardian, or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development. . . .

14

The language of RCW 13.34.030(6)(c) recognizes the inability to judge the capability or incapability of a parent in the abstract. Simply finding a parent incapable is insufficient for a dependency. Instead capability must be evaluated in the context of whether the parenting constitutes a danger of substantial damage to the child's psychological or physical development. The trial court made no such assessment.

Tabitha Thomas argues that the State must show her an unfit parent in order to establish a dependency over her children. Much law supports Thomas' position. The due process clause of the state and federal constitution may also demand such a conclusion.

A longstanding tenet of Washington law declares that a parent has the natural and legal right to the custody and control of her children, unless so completely unfit for such duties that the welfare of the children themselves imperatively demanded another disposition of their custody. *In re Dependency of T.J.B.*, 115 Wn. App. 182, 187, 62 P.3d 891 (2002), *review granted, judgment rev'd sub nom., In re Dependency of Brown*, 149 Wn.2d 836, 72 P.3d 757 (2003). The legislature recognized this right in RCW 13.34.020, in which it declared that "the family unit should remain intact unless a child's right to conditions of basic nurture, health, or safety is jeopardized."

Both the United States and Washington Constitutions recognize a parent's fundamental liberty interest in care and custody of her children. U.S. CONST. amends. V, XIV; WASH. CONST., art. I, § 3; *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388,

15

71 L. Ed. 2d 599 (1982); *In re Custody of Smith*, 137 Wn.2d 1, 27, 969 P.2d 21 (1998). The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents. *Santosky v. Kramer*, 455 U.S. at 753. The concept that all children are wards of the state and that the state and its agencies have an unhampered right to determine what is best for the child belongs to a repudiated political and moral philosophy foreign and repugnant to American institutions. *In re Welfare of Warren*, 40 Wn.2d 342, 343, 243 P.2d 632 (1952). Courts undertake a grave responsibility when they deprive parents of the care, custody and control of their natural children. *In re Welfare of Sego*, 82 Wn.2d 736, 738, 513 P.2d 831 (1973).

In *Dependency of T.J.B.*, this court agreed with the appellant that RCW 13.34.030(6)(c) (formerly RCW 13.34.030 (5)(c)) requires a finding of current unfitness as a prerequisite to a finding of dependency. 115 Wn. App. at 188. An existing ability or capacity of parents to adequately and properly care for their children is inconsistent with a status of dependency. 115 Wn. App. at 188. *In re Dependency of D.F.-M.*, 157 Wn. App. 179, 236 P.3d 961 (2010) implies, but does not hold, that the child of a fit parent cannot be declared a dependent of the State.

The State emphasizes that a child may be declared dependent despite a fit parent. The State relies on *In re Welfare of Key*, 119 Wn.2d 600, 836 P.2d 200 (1992), for this proposition. Nevertheless, in *Key*, the Supreme Court held that the fit mother impliedly

16

consented to the dependency. Upon wishing to return Kirsten home, the mother could revoke her consent. Moreover, the mother could veto any placement decision made by the State. More importantly, the trial court denied a dependency on the ground of RCW 13.34.030(6)(c) because the mother was fit. The trial court granted the dependency on a unique statutory provision covering developmentally disabled children, the former RCW 13.34.030(2)(d) (1987). Kirsten Key suffered from spastic quadriplegia, cerebral palsy, respiratory distress, and osteoporosis. *Key* supports a conclusion that Karen, Cathy and Georgia are not dependents under RCW 13.34.030(6)(c), because Tabitha Thomas has not been declared unfit and that Thomas, as mother, holds the right to determine the placement of her daughters.

The State also relies on *In re Dependency of Schermer*, 161 Wn.2d 927, 169 P.3d 452 (2007). *Schermer* is a matchless decision because the State resisted a dependency, while both the child and the parents sought the dependency. Henry Schermer suffered severe mental health issues and engaged in deviant sexual activities. The parents could not safely care for Henry at home and reasonably feared that Henry might kill them. They could not pay for his placement outside the home without selling their home. The State argued that a dependency requires a showing of deficiencies in a parent, but not unfitness. The Supreme Court agreed and noted that unfitness is not an absolute prerequisite to dependency. *Schermer* could be read as standing for the proposition that, except in cases of severe disabilities of the child, unfitness is required. Its holding that

17

the State must show deficiencies supports Tabitha Thomas since the trial testimony established no current deficiency.

Alas, this court need not decide whether the State must prove unfitness of Tabitha Thomas or whether the evidence supports a parental deficiency. The trial court's failure to find incapability creating a danger of substantial harm alone requires reversal.

*In re Dependency of C.M.*, 118 Wn. App. at 651 (2003) illustrates a case in which a dependency under RCW 13.34.030(6)(c) was supported by sufficient evidence and findings of fact. The trial court entered a finding of fact that "the child is in circumstances which constitute a danger of substantial damage to his physical and psychological development because these special needs are not being addressed and met." The child's pediatrician testified that the child showed language development delays and the three-year-old child's memory did not correlate to the average child's memory at that age. The pediatrician testified that the father provided insufficient stimulation from activities like talking to the child, reading to him, and other developmental activities. A therapist testified the father's cognitive problems interfered with his ability to implement proper parenting techniques. The therapist echoed the pediatrician's testimony that the child encountered significant cognitive delays. This court wrote:

> While the record shows that McCracken loves C.M. and does his best to care for him, there remains substantial evidence that C.M. has developmental delays that could result in significant psychological damage

18

if they remain unaddressed. And there is substantial evidence that McCracken's own mental illness and poor judgment have affected his ability to address these delays, despite his best intentions and his best efforts.

*In re Dependency of C.M.*, 118 Wn. App. at 654.

*C.M.* highlights what is missing in the present appeal. In addition to the absence of a finding of substantial harm to any of the Rees daughters, this appeal lacks evidence to support such a finding. No physician, therapist, or counselor testified to any particular needs of any of the sisters, let alone the inability of Tabitha Thomas to care for the needs. Amanda Plumb, the State's only witness, without any health care qualifications, speculated that Karen suffers from posttraumatic stress disorder, but no medical testimony supported such a diagnosis. Plumb mentioned trauma experienced by the girls in the Nevada home of Thomas, but provided no details of the trauma, let alone its impact on the girls. Assuming the purported trauma included sexual abuse of Karen by Mark Gregory, authorities concluded that the abuse did not occur. Plumb speculated that Gregory may have access to Thomas' home, but provided no direct evidence of such. Plumb provided no testimony that the current care givers for each of the girls could better handle the needs of the girls than their mother Tabitha Thomas. Plumb provided no testimony that Thomas would thwart the development of her three daughters.

I recognize the need to defer to the trial court's factual decisions. To evaluate a parent's claim of insufficient evidence of dependency, we determine whether substantial

19

evidence supports the court's findings of fact and whether the findings support the conclusions of law. *In re Dependency of S.S.*, 61 Wn. App. 488, 504, 814 P.2d 204 (1991). In a dependency proceeding, evidence is substantial if, when viewed in the light most favorable to the party prevailing below, it is such that a rational trier of fact could find the fact in question by a preponderance of the evidence. *In re Dependency of C.B.*, 61 Wn. App. 280, 286, 810 P.2d 518 (1991). This court is not to weigh the evidence or the credibility of witnesses. *In re Welfare of Sego*, 82 Wn.2d 736, 739-40 (1973). Nevertheless, the trial court below omitted a critical finding that any incapability of Tabitha Thomas created circumstances constituting a danger of substantial damage to any child's mental or physical development.

I also recognize that this court can imply a finding by the lower court. The termination of parental rights must be based, in part, on an explicit or implicit finding of current parental unfitness. *In re Welfare of A.B.*, 168 Wn.2d 908, 920, 232 P.3d 1104 (2010). If the finding is not explicit, the court may imply the finding if the record clearly shows that the trial court found the parent currently unfit to parent. *Welfare of A.B.*, at 921; *In re Welfare of A.G.*, 160 Wn. App. 841, 843, 248 P.3d 611 (2011). In *Welfare of A.G.*, this court reversed a termination of parental rights. We refused to imply a finding of parental unfitness despite evidence of domestic violence impacting the health of the children and the parent's chemical dependency.

Implying a finding is particularly improper when the evidence does not support the

20

finding. The trial court omitted the finding for good reason. The trial testimony included no evidence that Tabitha Thomas' care for Karen, Cathy and Georgia would lead to substantial damage to their respective psychological or physical developments.

The trial evidence possesses other problems. When testifying about Tabitha Thomas, Amanda Plumb based most testimony on Nevada CPS records. In short, the testimony was hearsay and could have included multiple levels of hearsay. The rules of evidence apply to a dependency hearing. RCW 13.34.110(1); ER 1101(c)(3); *In re Dependency of K.N.J.*, 171 Wn.2d 568, 579, 257 P.3d 522 (2011). The Nevada records are not even available for this court's review to determine if Plumb accurately portrayed their contents.

In *In re Welfare of X.T.*, 174 Wn. App. 733, 300 P.3d 824 (2013), this court reversed a finding of dependency on the ground that the Department of Social and Health Services social worker's testimony was based on her review of the department's file. This court observed that the trial court's discretion does not permit juvenile courts to disregard evidence rules, especially when the deprivation of parental rights is involved. The court held that parents should not be deprived of parental rights on hearsay, a form of unsworn testimony. A social worker may refer to a written report to show the basis of the worker's opinion, but written reports are not substantive evidence.

Tabitha Thomas objected to only details of alleged abuse when Amanda Plumb testified based on hearsay. The trial court allowed the testimony and could allow all

21

hearsay testimony but only for the limited purpose of supporting Amanda Plumb's opinion. Nevertheless, the testimony could not be used as substantive evidence and be the basis for the dependency ruling. Stale hearsay is an unfortunate foundation to base a finding of dependency.

The trial court is the judge of the credibility of witnesses. Nevertheless, the lower court never discounted Melissa Blodgett as a witness, who, unlike Amanda Plumb, saw Tabitha Thomas and directly observed her parenting skills. Blodgett's unimpeached testimony conclusively established the ability of Tabitha Thomas to capably parent Karen, Cathy and Georgia. This court's majority pretends that Melissa Blodgett never testified.

The State emphasizes that Karen, Cathy and Georgia have special needs that Tabitha Thomas is not yet trained to meet. Nevertheless, the evidence only supports Karen holding special needs and such evidence relies on hearsay. Amanda Plumb testified that Karen "may" suffer from posttraumatic stress disorder. Plumb further opined that Karen "may" have reactive attachment disorder in that she attaches quickly to others. Even if Plumb was an expert who could diagnose a disorder, the testimony is worthless because the opinion is based on a possibility not a probability. Once a court is satisfied with a witness' expertise, the test for admissibility is whether the expert can express an opinion based on reasonable probability rather than mere conjecture or

22

speculation. *Davidson v. Mun. of Metro. Seattle*, 43 Wn. App. 569, 571, 719 P.2d 569 (1986).

Trial evidence also fails to identify how a parent should treat Karen's needs, why Tabitha Thomas is deficient in meeting the needs, what training Thomas needs to meet the needs and the length of the training, and whether someone else meets those needs now. Many parents are initially unfit to meet the needs of special children, but those parents learn with experience. The State does not remove children born with special needs from parents until the parents have the opportunity, but fail, to learn to meet the needs.

The State mentions Cathy's and Georgia's fear of the outdoors, trees, and bugs. The testimony comes from a statement made by a caretaker to Amanda Plumb. Thus the testimony is also hearsay. Counsel and the trier of fact were unable to explore the precise fears of the girls. Many children are frightened of bugs and swaying trees in the dark of night. No evidence suggests that such a fear creates special needs.

Amanda Plumb expressed concern about the size of Tabitha Thomas' Las Vegas home. In *In re Dependency of D.F.-M.*, 157 Wn. App. at 193 (2010), a social worker complained that the father's house had too few bedrooms. This court emphasized that courts, not administrative agencies or individual social workers, are the ultimate evaluators of a parent's ability to care for his child. The court noted that many children have been happily raised without bedrooms of their own.

23

Amanda Plumb registered alarm about Karen, Cathy and Georgia encountering Mark Gregory at Tabitha Thomas' home. On appeal, the State characterizes the potential for the girls seeing Gregory as the most alarming aspect to returning Karen, Cathy and Georgia to their mother. The State even falsely claims that Gregory subjected all three girls to sexual abuse. This testimony is based solely on hearsay. Only Karen alleged sexual abuse and authorities concluded the allegation was false.

Plumb declared: "from what I've gathered, [Andrew] has visits with him [Mark.]" CP at 165. Thus, this evidence of any encounter between Mark Gregory and Karen, Cathy and Georgia is based on more hearsay. The testimony does not even establish the possibility of a visit between Andrew and his father at the Thomas' home. Assuming any visits, the visits could be at Gregory's home.

Even assuming an encounter between Mark Gregory and one or more of the Rees daughters, such is not grounds for creating a dependency. In *In re Dependency of M.S.D.*, 144 Wn. App. 468, 182 P.3d 978 (2008), the trial court ordered a dependency based on the State's concern that the mother failed to protect her daughter from her boyfriend, Seth Poirer. Poirer had a ten-year-old conviction for assault and criminal mistreatment of his two-month-old baby. The mother's brother also reported to police that Poirer sexually abused M.S.D. Nevertheless, a physician, who examined M.S.D., ruled out sexual abuse. This court reversed the dependency, even after recognizing the appellate principle that this court must affirm the trial court if substantial evidence

24

supports the findings of fact. This court observed that a poor choice of a partner is not a reason for the State to interfere in the life of a family. In this appeal, authorities concluded that Mark Gregory did not abuse Karen.

In short, Amanda Plumb frets about an immediate return of Karen, Cathy and Georgia to Tabitha Thomas, but her testimony lacked evidence of Tabitha Thomas being an incapable parent or that placement with Thomas would cause substantial damage to any of the three daughters. A social worker's worries should not control dependency law. Plumb declared that she wants "to make absolute sure with an ICPC [study] that these children are gonna be moving back to a safe environment." CP at 213. Other parents are not subjected to an exacting standard of absolute certainty that the home is a safe environment. Tabitha Thomas does not deserve this standard applied to her.

The court commissioner and superior court judge failed to analyze the dependency of the other daughters, Cathy and Georgia, separate from the dependency of Karen. Scant, if any, evidence supported a conclusion that Tabitha Thomas is incapable of caring for her daughter, Karen. Even less evidence supports a conclusion that Thomas is incapable of caring for the two younger girls, let alone care by Thomas would substantially damage the girls' development.

Interstate Compact on Placement of Children

To excuse the denial of Tabitha Thomas' rights to her children, the State, pursuant to the Interstate Compact on Placement of Children, sought an order directing Nevada to

25

investigate the home of Thomas for later placement of Karen, Cathy and Georgia in the home. Such an order violates the law because the order directs an investigation of a parent's home contrary to the terms of the ICPC.

In *In re Dependency of D.F.-M.*, 157 Wn. App. at 190-91 (2010), this court addressed whether the ICPC applies to parental placements. We held in the negative. Alyce Fabian-Miller bore D.F.-M. Six months later a Washington court entered an order declaring Rico Verner as D.F.-M.'s father. Three years later, the State took D.F.-M. into protective custody because of neglect, domestic violence, and drug use by Fabian-Miller. Thereafter, Verner learned of the dependency and demanded dismissal of the dependency and placement of the child with him at his home in Oklahoma. The State conceded it lacked evidence that Verner was an unfit parent. Nevertheless, the State did not wish to allow placement of D.F.-M. with Verner until Verner's home state agreed to placement under the ICPC. The trial court ordered D.F.-M. placed with Verner and Fabian-Miller appealed. The State joined with Fabian-Miller in arguing the provisions of the ICPC should be fulfilled before placement with Verner. This court affirmed immediate placement with Verner in part on the ground that the ICPC did not apply to investigating the capability of a parent.

A group of state social service administrators drafted the Interstate Compact on Placement of Children in the 1950s to address the problem of providing services to children placed across state lines. The compact seeks to foster cooperation and

26

information sharing among member states so as to ensure that children requiring placement receive the maximum opportunity to be placed in a suitable environment with a desirable degree and type of care. All fifty states, the District of Columbia, and the United States Virgin Islands have adopted the ICPC. Washington enacted the compact in 1971. RCW 26.34.010.

Under article III of the ICPC, the scope of the compact is limited to placements in foster care or preliminary to an adoption. Article III also sets out the requirements for a valid placement. No sending agency shall send to another state any child for placement in foster care or as a preliminary to a possible adoption unless the sending agency complies with the ICPC, which requires the sending agency to notify the receiving state of the intended placement and to provide such documents as may be necessary to carry out the ICPC's purposes. The placement may not occur until the receiving state notifies the sending agency in writing that the proposed placement does not appear to be contrary to the interests of the child.

The ICPC does not define "foster care." In *D.F.-M.*, we noted that the plain, ordinary meaning of the term is the placement of a child in a substitute home, one other than that of the child's parents. Under article II(d) of the ICPC, "placement" means "the arrangement for the care of a child in a family free or boarding home or in a child-caring agency or institution . . . and any hospital or other medical facility." In *D.F.-M.*, we further observed that, although "family free" or "boarding" homes are not defined in the

27

compact, these terms refer to nonparental residential arrangements that provide children with the care usually received from parents. Unlike a boarding home, the care provided by a family free home is free of charge. Based on these observations, we held that the provisions of the ICPC could not be employed to investigate a parent's home before placement of a child with a parent. The compact applies only to foster care or placements preliminary to possible adoption, neither of which is a parental placement. Because this court ruled based on construction of the compact, we did not address Rico Verner's alternative argument that application of the ICPC to parental placements violates the due process clause.

The State seeks to distinguish *D.F.-M.* on the ground that the Oklahoma father actually saw the children, whereas Tabitha Thomas has not seen her daughters for three years. No reading of *D.F.-M.* supports such a distinction being valid. We did not leave any door open to permitting the use of the ICPC in parental placement under other circumstances. The terms of the ICPC admit no exception to its limitation against applying to a parental placement.

The majority writes that it lacks a record as to the State of Nevada's ICPC involvement so Tabitha Thomas' objection to the application of the compact is premature. The majority's comment fails to recognize that *D.F.-M.* holds that Nevada is to have no ICPC involvement. The extent or record of this involvement is immaterial.

28

The trial court ordered involvement contrary to the ICPC that does not apply to parental placements.

The majority also writes that any prohibition of employing ICPC for a parental placement does not eliminate cooperation between the two states as the parties work toward reunification. The majority does not explain what cooperation is needed or permissible and why two states would cooperate outside their authority to act. Again, the trial court ordered an ICPC placement review in Nevada contrary to the interstate compact, state statute, and this court's decision. A court's sanctioning of extralegal and unauthorized conduct by a state agency against the will of the legislature creates a dangerous precedence. Therefore, I respectfully dissent.

_____
Fearing, J.