Fearing, J.
(dissenting)
¶26 — This appeal arises from consolidated dependency petitions involving eight children, all related by blood or cohabitation. The appeal concerns three of the children identified in the majority opinion as Ca.R., born January 19, 2002; Cl.R., born January 17,2005; and G.R., born October 7, 2006. For ease in reading, I refer to the three girls respectively and fictitiously as Karen, now age thirteen; Cathy, now age ten; and Georgia, now age nine. The three girls are sisters and the biological daughters of appellant T.T., who resides in Las Vegas. W.R. is the biological father of Karen and Georgia and listed on the birth certificate of Cathy as Cathy’s father, although another gentleman is the biological father. The parties consider W.R. as the father of all three girls.
¶27 In January 2014, when the State of Washington intervened in the lives of Karen, Cathy, and Georgia, the three lived with their father, W.R., and his girlfriend, Alicia Huante, in Spokane. Huante bore other children, who resided in the household, including male twins born in December 2012. W.R. is the father of the twins. The State removed Karen, Cathy, and Georgia from their Spokane home because of allegations of sexual abuse by W.R. The *613 State of Washington also removed from the household the twins and three Greenleaf children, two girls and one boy, whose mother is Alicia Huante.
¶28 The trial court declared Karen, Cathy, and Georgia dependents of the State of Washington based on a conclusion that neither T.T. nor W.R. are capable of parenting the three within the meaning of RCW 13.34.030(6)(c). The statute allows a dependency when no parent is capable of adequately caring for a child, such that the child is in circumstances which constitute a danger of substantial damage to the child’s psychological or physical development. The trial court did not find that T.T.’s care for any of the three daughters would constitute a danger of substantial damage, and the evidence would not support such a finding. The State would not return the two younger girls to T.T. because the girls have a fear of the outdoors, bugs, and trees. T.T. appeals the dependency ruling and argues that substantial evidence does not support the dependency finding. I agree. I would reverse the trial court and dismiss the dependency petition.
¶29 The trial court ordered a placement study by Nevada authorities, under the “Interstate Compact on Placement of Children” (ICPC), ch. 26.34 RCW. In addition to determining whether to uphold the dependency, this court must also decide whether the trial court had authority to order such a study. It did not.
FACTS
¶30 The case’s facts derive from a one-day dependency trial before a court commissioner. During the trial, the State’s sole witness, social worker Amanda Plumb, testified to the background of T.T. Plumb’s basis of knowledge for the background was Nevada Child Protective Service (CPS) binders, but the State did not seek to introduce the records in the binders as an exhibit. During her testimony, Plumb did not refer to the records to confirm she testified consis *614 tently with the records. Plumb never met T.T. and thus never observed her with children. Plumb knew T.T. only from what Plumb read, including recent Nevada reports that establish that T.T. performs well as a mother.
¶31 T.T. is the mother of seven children, three of whom are the subject of this appeal. In addition to Karen, Cathy, and Georgia, T.T. bore Faith, a daughter older than the three girls; Terrance, who resides on an Indian reservation in North Dakota; Andrew, born in 2011; and Zeke, born in 2013. “Andrew” and “Zeke” are also ersatz monikers. The ages of Faith and Terrance are unknown.
¶32 Physicians have diagnosed T.T. with posttraumatic stress disorder, panic disorder, and agoraphobia. She has suffered domestic violence. T.T. now receives counseling for her mental health disorders.
¶33 At trial, Amanda Plumb averred that a report in the binder commented that Faith tried to drown a seven-year-old. According to one report, both Faith and T.T. bang their respective heads against a wall.
¶34 Karen, Cathy, and Georgia lived with their mother, T.T., in Nevada until 2011. We do not know when T.T. and W.R., the father of the three girls, separated. In 2011, the State of Nevada removed Karen, Cathy, Georgia, and younger brother Andrew from T.T.’s home in Las Vegas. Nevada filed a dependency petition and alleged sexual abuse of Karen by T.T.’s former boyfriend and Andrew’s father, Mark Gregory; domestic violence against T.T. by Gregory; and drug use by T.T. Authorities later determined that Karen fabricated the allegation of sexual abuse by Gregory.
¶35 Upon removal from their mother’s Nevada home, Karen, Cathy, and Georgia lived with their father, W.R., in Oregon. The State of Nevada then dismissed the dependency proceeding with regard to the three girls. In 2013, the sisters moved to Spokane with their father and his companion, Alicia Huante.
¶36 Amanda Plumb testified that children of T.T. have been “removed, returned, removed, and returned” by Ne *615 vada on multiple occasions, beginning in 2000. Clerk’s Papers (CP) at 162. Plumb gave scant details. As already written, the State of Nevada removed Andrew, along with the three girls, in 2011. Nevada returned Andrew to T.T. sometime in 2011. Nevada removed Andrew again on February 22, 2013.
¶37 T.T. has not had physical contact with Karen, Cathy, and Georgia since their removal from her Nevada home in 2011. Since removal, T.T. has regularly spoken on the telephone with all three daughters, particularly with the oldest daughter, Karen. She speaks with Karen at length every evening for up to an hour. She helps Karen with homework. The mother and daughter discuss school, grades, attitudinal problems, positive ideals, and helping around the house. Karen initially expressed frustration to T.T. about mistakes T.T. made in the latter’s life. According to T.T., Karen has forgiven her, in part, because T.T. unfailingly calls Karen and speaks consistently.
¶38 T.T. respectively speaks with Cathy and Georgia about once a week for five minutes to a half hour. T.T. speaks to the younger girls about school and favorite things. The foster mother of Cathy and Georgia taught them songs to sing to their mother because they initially lacked subjects to discuss.
¶39 As a result of the 2011 Nevada dependency proceeding, T.T. underwent intensive outpatient drug treatment for six months. Since April 2012, T.T. has successfully completed random and frequent urinalyses. T.T. also underwent domestic violence counseling for one year and still engages in mental health counseling. She took a parenting class.
¶40 Upon the May 2013 birth of Zeke, T.T. remained under the specter of a Nevada dependency, so the State assigned Zeke to reside with his father, Anton Ort. Ort has no CPS history. Ort and T.T. now cohabit, and Nevada returned Andrew to T.T. on July 1, 2013. Anton Ort helps raise both boys. Ort and T.T. plan to marry.
*616 ¶41 Anton Ort, T.T., Andrew, and Zeke live in a three bedroom, two bathroom apartment obtained for them by Las Vegas’ Women’s Development Center. Random urinalysis is a prerequisite to occupancy in the apartment complex. Women’s Development Center could establish family counseling for T.T. and her three daughters. T.T. has a support system through her church, Victory Outreach, and through other families she has met. A YMCA, providing recreation for the children, is a five minute walk from her apartment.
¶42 In January 2014, Karen Rees and one of the Greenleaf daughters respectively alleged that W.R. sexually abused her. Spokane authorities currently investigate the allegations, but the State has filed no criminal charges against W.R. Since some of the purported abuse of Karen allegedly occurred in Oregon, Oregon authorities also currently investigate the charges. As of the May 2014 trial in this dependency proceeding, Karen lived in Spokane’s Sally’s House and Cathy and Georgia resided together in foster care.
¶43 Amanda Plumb, the state social worker, testified at trial that Karen, Cathy, and Georgia currently fare well. The three encounter no medical problems. According to Plumb, Karen Rees is a very sweet, happy, and bright girl who has overcome adversity. Cathy and Georgia are also happy, and they perform well academically and developmentally.
¶44 According to Amanda Plumb, Karen, despite her happiness, exhibits behavioral issues. Plumb opined that Karen “may” have reactive attachment disorder in that she attaches quickly to others. Karen occasionally expresses rage, and she bangs her head against the wall. Plumb declared that Karen needs constant attention.
¶45 Amanda Plumb testified that Karen reports nightmares. Karen fears that her father will kidnap and punish her for reporting sexual abuse. She is anxious when she rides on the Spokane street where she lived with her father and Alicia Huante. Plumb hinted that Karen suffers from *617 posttraumatic stress disorder, but Plumb did not provide any background to qualify her for diagnosing the disorder. Plumb declared that a caretaker of Cathy and Georgia reported that both lasses are afraid of “everything, bugs, outdoors, trees, everything.” CP at 169.
¶46 Amanda Plumb testified that T.T. has not agreed to engage in any services with the State. Plumb did not identify what services, if any, the State offered to T.T. T.T. called Plumb to inform her that Karen’s glasses broke. T.T. advocated for new glasses for her daughter.
¶47 During trial, Amanda Plumb recommended denial of placement of Karen, Cathy, and Georgia with T.T. at this time. Plumb opined that raising older girls differs from raising one- and three-year-old boys. According to Plumb, the girls were repeatedly traumatized in T.T.’s care. Plumb did not provide details of any of the purported trauma. Remember that Nevada authorities concluded that Karen had not been sexually abused.
¶48 Amanda Plumb testified that the Rees daughters reported to her fear of Mark Gregory, the purported sexual abuser of Karen. Plumb provided no testimony that Mark would have contact with the girls if placed with T.T. Plumb declared: “[F]rom what I’ve gathered [Andrew] has visits with him [Mark].” CP at 165.
¶49 Amanda Plumb conveyed concern about T.T.’s ability to care for Karen when Karen exhibits difficult behavior. Plumb declared:
[M]y concern is does [T.T.] right now, currently have the ability and is she suited to take care of those behaviors. I’m not saying she can’t but I wanna make sure before we just place [Karen] who has been traumatized by several different people back into a situation into the same city. . . . What’s, what how is that PTSD [posttraumatic stress disorder] gonna manifest in [T.T.’s] home and is T.T. equipped to handle that.
CP at 169. Plumb wants “to make absolute sure with an ICPC [study] that these children are gonna be moving back to a safe environment.” CP at 213.
*618 ¶50 Amanda Plumb expressed concern to the trial court that placement of Karen, Cathy, and Georgia with T.T. would more than double T.T.’s household. Plumb has not seen the facility in which T.T. resides. Plumb expressed concern about T.T. relapsing into drug use. Plumb desires T.T. to undergo training geared toward parenting children with behavioral issues and to engage in family therapy with the daughters.
¶51 Amanda Plumb recognized T.T.’s recent improvements in parenting skills and the potential of returning the three daughters to T.T. Nevertheless, Plumb wished Nevada to perform an ICPC placement study and the family to engage in counseling before a return.
¶52 During her trial testimony on the telephone from Las Vegas, T.T. pledged to care for her two young boys and her three daughters. She does not work outside the home. Her fiancé, Anton Ort, remains available to assist. T.T. noted that all but one of the children is of school age, so she will receive daily breaks. T.T. wishes to engage the children in church activities.
¶53 T.T. recognizes now that she earlier chose abusive partners, took controlled substances, and placed her children in unsafe situations. She testified she will not repeat these errors because of her support system, her drug treatment, and ongoing counseling. T.T. is pleased with her life during the last two years.
¶54 The State ignores trial testimony from Melissa Blodgett, a family services specialist with the Department of Family Services in Clark County, Nevada. Blodgett serves as a caseworker who works with parents and children involved with CPS. She has a bachelor’s degree in human resources management and intensive training with the Department of Family Services. Blodgett served as T.T.’s caseworker from August 2013 until January 2014, when Nevada dismissed the dependency action concerning Andrew. Upon assuming duties with T.T., Melissa Blodgett reviewed T.T.’s Nevada case file. The file did not confirm a *619 chronic history of drug abuse or neglect of children claimed by the State of Washington.
¶55 According to Melissa Blodgett, T.T. completed intensive outpatient therapy services. She also completed parenting and domestic violence counseling. T.T. passed urinalyses during the entire dependency proceeding.
¶56 Melissa Blodgett observed T.T. during ten to twelve visits with her two young boys. T.T. performed well as an attentive parent. Nevada returned the children to T.T. because of T.T.’s performance and at the recommendation of service providers and experts, including drug and alcohol treatment experts.
¶57 Melissa Blodgett testified that T.T.’s son Andrew has special needs and receives speech therapy. T.T. diligently safeguards the therapy, and Andrew has progressed far with his speech development. Despite the dependency ending, Blodgett saw Andrew in April 2014 and Blodgett understood each word uttered by the boy. Andrew’s mental and physical development has progressed well.
¶58 According to Melissa Blodgett, Anton Ort, who lives with T.T. and the two young boys, has no CPS history. The State of Nevada kept Zeke with Ort upon Zeke’s birth, despite the dependency pending with T.T. Ort performed well as Zeke’s father. He could assist in parenting Karen, Cathy, and Georgia. Blodgett supports all five children living in T.T.’s current physical residence. The home has three bedrooms and adequate space for the children. The home is fully furnished.
¶59 According to Melissa Blodgett, Las Vegas’ Women’s Development Center continues to provide services to T.T. The center assisted T.T. in obtaining the housing; referred her to counseling; and assists her in safety planning, money management, and daily living skills.
¶60 Melissa Blodgett observed that T.T. is motivated to be a parent and is capable of caring for more children than the two boys. Blodgett holds that T.T. could care for older *620 children. T.T. has shown exemplary parenting skills for her two sons. The two boys are well loved and cared for. T.T. has a clear understanding of appropriate parenting and demonstrates it through her behavior and interactions with her children. She continues to engage in counseling and mental health services. Blodgett exudes confidence in T.T. despite Blodgett’s knowledge ofT.T.’s CPS history. Blodgett credits the intensive outpatient substance abuse treatment for changing T.T.
¶61 Melissa Blodgett testified that, if T.T. needed assistance, she knows where to obtain help. T.T. has been proactive in obtaining assistance for Andrew. T.T. remains in contact with Blodgett, despite no requirement of contact. T.T. continues to ask Blodgett for advice and updates Blod-gett on the condition of T.T.’s two young boys.
PROCEEDING
¶62 The State of Washington petitioned for a dependency of Karen, Cathy, and Georgia Rees, among others. W.R. agreed to the dependency with regard to his five children that are the subject of the petition. T.T. requested that her three daughters be returned to her in Nevada.
¶63 After a one-day trial, the court commissioner refused to return Karen, Cathy, and Georgia to T.T. The commissioner concluded that all three daughters are dependent within the meaning of RCW 13.34.030(6)(c).
¶64 The court commissioner entered the following findings of fact:
a. [T.T.] has done an extraordinary amount of work during her dependency in Nevada to obtain the return of two of her children, [Zeke], age 1, and [Andrew], age 3. She successfully completed the following services: Intensive outpatient treatment, domestic violence counselling, mental health counsel-ling, parenting classes, and providing clean [urinalyses]. [T.T.] has maintained stable housing and has regular contact with her previously assigned social worker, Melissa Blodgett. *621 Prior to the Nevada Dependency, she had a significant history of concerning behavior, including substance abuse and making poor choices in relationships.

c. The children have experienced traumatic situations while placed with their father. [Karen] has disclosed that she has suffered sexual abuse by her father.
d. The court is concerned that the services provided during mother’s dependency in Nevada were not directed at reunifying her with [Karen, Cathy, and Georgia] because they were already placed with their father. Instead, the services were focused on returning the children’s half siblings.
e. The trauma that the children experienced in the mother’s home (mother’s substance abuse and domestic violence as well as [Karen’s] disclosure of sexual abuse by mother’s former partner) has not been addressed. The allegations of sexual abuse were investigated and did not result in a founded finding by Nevada CPS. Service of counseling will address this concern.
f. [Karen] has significant behavioral and emotional issues. She is just now beginning to deal with these issues in counseling. Her behavior appears to be parentified. If she were to be placed with her mother today she would suddenly have new siblings and a new father figure as well as re-adjusting to living with her mother. This could set the family up for failure. This case needs to progress slowly enough that it won’t disrupt the family.
g. [Karen] needs individual and family counseling to process what she has been through.

i. An ICPC approval is needed so that the State of Nevada will provide oversight of the family if [Karen] is placed in the home.
j. The court finds that a “C” [RCW 13.34.030(6)(c)] dependency has been established by a preponderance of the evidence. [T.T.] is currently not capable of parenting [Karen, Cathy, or Georgia] due to the unresolved issues that led to the dependency in Nevada. Specifically, [T.T.] needs to repair her relationship with the girls, and to demonstrate that she can *622 attend to their emotional needs including participating in any family counsel[ ]ing or other therapy needed. Mother also needs to continue her commitment to sobriety.
CP at 393-94.
¶65 RCW 13.34.030(6)(c) requires a finding, before entry of a dependency, that the inability of the parent to care for the child creates circumstances that constitute a danger of substantial damage to the child’s psychological or physical development. The court commissioner entered no finding of fact or conclusion of law that placement of any or all of the three daughters with T.T. would create a danger of substantial harm.
¶66 T.T. asked a superior court judge to revise the commissioner’s order. The court denied her revision request. The court adopted the commissioner’s findings of fact and added the following finding:
2. A dependency is an appropriate vehicle to provide a family with services [to] remedy issues in the parent/child relationship and to ensure a smooth transition when adding three additional children to the home. The finding of dependency was based upon the children’s needs, to ensure their safety and that a move to their mother’s home would be done in an appropriate manner that meets their needs. It will be helpful to this family to have a social worker in Nevada, assigned through the ICPC process, who will help to provide services and supports in reintroducing these children to their mother’s home.
CP at 385.
LEGAL ANALYSIS
Dependency Sufficiency of Evidence
¶67 T.T. argues a lack of evidence supports the declaration of her children as state dependents. RCW 13.34.030(6) lists four conditions under which a court may declare a child a dependent of the State of Washington. To declare a child dependent, the trial court must find by a preponder- *623 anee of evidence that the child meets one of the statutory definitions. In re Welfare of Key, 119 Wn.2d 600, 612, 836 P.2d 200 (1992); In re Dependency of C.M., 118 Wn. App. 643, 648, 78 P.3d 191 (2003). The State relies on the definition found in RCW 13.34.030(6)(c).
¶68 RCW 13.34.030(6) defines “dependent child,” in part, as any child who
(c) [h]as no parent, guardian, or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child’s psychological or physical development ....
The language of RCW 13.34.030(6)(c) recognizes the inability to judge the capability or incapability of a parent in the abstract. Simply finding a parent incapable is insufficient for a dependency. Instead, capability must be evaluated in the context of whether the parenting constitutes a danger of substantial damage to the child’s psychological or physical development. The trial court made no such assessment.
¶69 T.T. argues that the State must show her to be an unfit parent in order to establish a dependency over her children. Much law supports T.T.’s position. The due process clauses of the state and federal constitutions may also demand such a conclusion. U.S. Const, amends. V, XIV; Wash. Const, art. I, § 3.
¶70 A long-standing tenet of Washington law declares that a parent has the natural and legal right to the custody and control of her children, unless so completely unfit for such duties that the welfare of the children themselves imperatively demanded another disposition of their custody. In re Dependency of T.J.B., 115 Wn. App. 182, 187, 62 P.3d 891 (2002), rev’d sub nom. In re Dependency of Brown, 149 Wn.2d 836, 72 P.3d 757 (2003). The legislature recognized this right in RCW 13.34.020, in which it declared that “the family unit should remain intact unless a child’s right to conditions of basic nurture, health, or safety is jeopardized.”
*624 ¶71 Both the United States and Washington Constitutions recognize a parent’s fundamental liberty interest in care and custody of her children. U.S. Const. amends. V, XIV; Wash. Const, art. I, § 3; Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982) (plurality opinion); In re Custody of Smith, 137 Wn.2d 1, 27, 969 P.2d 21 (1998), aff’d sub nom. Troxel v. Granville, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (plurality opinion). The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents. Santosky v. Kramer, 455 U.S. at 753. The concept that all children are wards of the State and that the State and its agencies have an unhampered right to determine what is best for the child belongs to a repudiated political and moral philosophy foreign and repugnant to American institutions. In re Welfare of Warren, 40 Wn.2d 342, 343, 243 P.2d 632 (1952). Courts undertake a grave responsibility when they deprive parents of the care, custody, and control of their natural children. In re Welfare of Sego, 82 Wn.2d 736, 738, 513 P.2d 831 (1973).
¶72 In Dependency of T.J.B., this court agreed with the appellant that RCW 13.34.030(6)(c) (formerly RCW 13.34-.030(5)(c)) requires a finding of current unfitness as a prerequisite to a finding of dependency. 115 Wn. App. at 188. An existing ability or capacity of parents to adequately and properly care for their children is inconsistent with a status of dependency. 115 Wn. App. at 188. In re Dependency of D.F.-M., 157 Wn. App. 179, 236 P.3d 961 (2010), implies, but does not hold, that the child of a fit parent cannot be declared a dependent of the State.
¶73 The State emphasizes that a child may be declared dependent despite having a fit parent. The State relies on In re Welfare of Key, 119 Wn.2d 600 (1992), for this proposition. Nevertheless, in Key, the Supreme Court held that the fit mother impliedly consented to the dependency. Upon wishing to return her daughter, Kirsten, home, the mother could revoke her consent. Moreover, the mother could veto *625 any placement decision made by the State. More importantly, the trial court denied a dependency on the ground of RCW 13.34.030(6)(c) because the mother was fit. The trial court granted the dependency on a unique statutory provision covering developmentally disabled children, former RCW 13.34.030(2)(d) (1987). Kirsten Key suffered from spastic quadriplegia, cerebral palsy, respiratory distress, and osteoporosis. Key supports a conclusion that Karen, Cathy, and Georgia are not dependents under RCW 13.34-.030(6)(c) because T.T. has not been declared unfit, and that T.T., as mother, holds the right to determine the placement of her daughters.
¶74 The State also relies on In re Dependency of Schermer, 161 Wn.2d 927, 169 P.3d 452 (2007). Schermer is a matchless decision because the State resisted a dependency, while both the child and the parents sought the dependency. Henry Schermer suffered severe mental health issues and engaged in deviant sexual activities. The parents could not safely care for Henry at home and reasonably feared that Henry might kill them. They could not pay for his placement outside the home without selling their home. The State argued that a dependency requires a showing of deficiencies in a parent, but not unfitness. The Supreme Court agreed and noted that unfitness is not an absolute prerequisite to dependency. Schermer could be read as standing for the proposition that, except in cases of severe disabilities of the child, unfitness is required. Its holding that the State must show deficiencies supports T.T. since the trial testimony established no current deficiency.
¶75 Alas, this court need not decide whether the State must prove unfitness of T.T. or whether the evidence supports a parental deficiency. The trial court’s failure to find incapability creating a danger of substantial harm alone requires reversal.
¶76 In re Dependency of C.M., 118 Wn. App. at 651 (2003) illustrates a case in which a dependency under RCW 13.34.030(6)(c) was supported by sufficient evidence and findings *626 of fact. The trial court entered a finding of fact that “ ‘ [t]he child is in circumstances which constitute a danger of substantial damage to his physical and psychological development because these special needs are not being addressed and met.’” In re Dependency of C.M., 118 Wn. App. at 651. The child’s pediatrician testified that the child showed language development delays and the three-year-old child’s memory did not correlate to the average child’s memory at that age. The pediatrician testified that the father provided insufficient stimulation from activities like talking to the child and reading to him, and other developmental activities. A therapist testified the father’s cognitive problems interfered with his ability to implement proper parenting techniques. The therapist echoed the pediatrician’s testimony that the child encountered significant cognitive delays. This court wrote:
While the record shows that McCracken loves C.M. and does his best to care for him, there remains substantial evidence that C.M. has developmental delays that could result in significant psychological damage if they remain unaddressed. And there is substantial evidence that McCracken’s own mental illness and poor judgment have affected his ability to address these delays, despite his best intentions and his best efforts.
In re Dependency of C.M., 118 Wn. App. at 654.
¶77 C.M. highlights what is missing in the present appeal. In addition to the absence of a finding of substantial harm to any of the Rees daughters, this appeal lacks evidence to support such a finding. No physician, therapist, or counselor testified to any particular needs of any of the sisters, let alone the inability of T.T. to care for the needs. Amanda Plumb, the State’s only witness, without any health care qualifications, speculated that Karen suffers from posttraumatic stress disorder, but no medical testimony supported such a diagnosis. Plumb mentioned trauma experienced by the girls in the Nevada home of T.T., but provided no details of the trauma, let alone its impact on the girls. Assuming the purported trauma included sexual *627 abuse of Karen by Mark Gregory, authorities concluded that the abuse did not occur. Plumb speculated that Gregory may have access to T.T.’s home, but provided no direct evidence of such. Plumb provided no testimony that the current caregivers for each of the girls could better handle the needs of the girls than their mother, T.T. Plumb provided no testimony that T.T. would thwart the development of her three daughters.
¶78 I recognize the need to defer to the trial court’s factual decisions. To evaluate a parent’s claim of insufficient evidence of dependency, we determine whether substantial evidence supports the court’s findings of fact and whether the findings support the conclusions of law. In re Dependency of S.S., 61 Wn. App. 488, 504, 814 P.2d 204 (1991). In a dependency proceeding, evidence is “substantial” if, when viewed in the light most favorable to the party prevailing below, it is such that a rational trier of fact could find the fact in question by a preponderance of the evidence. In re Dependency of C.B., 61 Wn. App. 280, 286, 810 P.2d 518 (1991). This court is not to weigh the evidence or the credibility of witnesses. In re Welfare of Sego, 82 Wn.2d 736, 739-40 (1973). Nevertheless, the trial court below omitted a critical finding that any incapability of T.T. created circumstances constituting a danger of substantial damage to any child’s mental or physical development.
¶79 I also recognize that this court can imply a finding by the lower court. The termination of parental rights must be based, in part, on an explicit or implicit finding of current parental unfitness. In re Welfare of A.B., 168 Wn.2d 908, 920, 232 P.3d 1104 (2010). If the finding is not explicit, the court may imply the finding if the record clearly shows that the trial court found the parent currently unfit to parent. Welfare of A.B., 168 Wn.2d at 921; In re Welfare of A.G., 160 Wn. App. 841, 843, 248 P.3d 611 (2011). In Welfare of A.G., this court reversed a termination of parental rights. We refused to imply a finding of parental unfitness despite evidence of domestic violence impacting the health of the children and the parent’s chemical dependency.
*628 ¶80 Implying a finding is particularly improper when the evidence does not support the finding. The trial court omitted the finding for good reason. The trial testimony included no evidence that T.T.’s care for Karen, Cathy, and Georgia would lead to substantial damage to their respective psychological or physical developments.
¶81 The trial evidence possesses other problems. When testifying about T.T., Amanda Plumb based most testimony on Nevada CPS records. In short, the testimony was hearsay and could have included multiple levels of hearsay. The rules of evidence apply to a dependency hearing. RCW 13.34.110(1); ER 1101(c)(3); In re Dependency of K.N.J., 171 Wn.2d 568, 579, 257 P.3d 522 (2011). The Nevada records are not even available for this court’s review to determine if Plumb accurately portrayed their contents.
¶82 In In re Welfare of X.T., 174 Wn. App. 733, 300 P.3d 824 (2013), this court reversed a finding of dependency on the ground that the Department of Social and Health Services social worker’s testimony was based on her review of the department’s file. This court observed that the trial court’s discretion does not permit juvenile courts to disregard evidence rules, especially when the deprivation of parental rights is involved. The court held that parents should not be deprived of parental rights on hearsay, a form of unsworn testimony. A social worker may refer to a written report to show the basis of the worker’s opinion, but written reports are not substantive evidence.
¶83 T.T. objected to only details of alleged abuse when Amanda Plumb testified based on hearsay. The trial court allowed the testimony and could allow all hearsay testimony, but only for the limited purpose of supporting Amanda Plumb’s opinion. Nevertheless, the testimony could not be used as substantive evidence and be the basis for the dependency ruling. Stale hearsay is an unfortunate foundation on which to base a finding of dependency.
¶84 The trial court is the judge of the credibility of witnesses. Nevertheless, the lower court never discounted *629 as a witness Melissa Blodgett, who, unlike Amanda Plumb, saw T.T. and directly observed her parenting skills. Blod-gett’s unimpeached testimony conclusively established the ability of T.T. to capably parent Karen, Cathy, and Georgia. This court’s majority pretends that Melissa Blodgett never testified.
¶85 The State emphasizes that Karen, Cathy, and Georgia have special needs that T.T. is not yet trained to meet. Nevertheless, the evidence supports only Karen holding special needs and such evidence relies on hearsay. Amanda Plumb testified that Karen “may” suffer from posttrau-matic stress disorder. Plumb further opined that Karen “may” have reactive attachment disorder in that she attaches quickly to others. Even if Plumb was an expert who could diagnose a disorder, the testimony is worthless because the opinion is based on a possibility, not a probability. Once a court is satisfied with a witness’ expertise, the test for admissibility is whether the expert can express an opinion based on reasonable probability rather than mere conjecture or speculation. Davidson v. Municipality of Metropolitan Seattle, 43 Wn. App. 569, 571, 719 P.2d 569 (1986).
¶86 Trial evidence also fails to identify how a parent should treat Karen’s needs, why T.T. is deficient in meeting the needs, what training T.T. needs to meet the needs and the length of the training, and whether someone else meets those needs now. Many parents are initially unfit to meet the needs of special children, but those parents learn with experience. The State does not remove children born with special needs from parents until the parents have the opportunity, but fail, to learn to meet the needs.
¶87 The State mentions Cathy’s and Georgia’s fear of the outdoors, trees, and bugs. The testimony comes from a statement made by a caretaker to Amanda Plumb. Thus, the testimony is also hearsay. Counsel and the trier of fact were unable to explore the precise fears of the girls. Many children are frightened of bugs and swaying trees in the dark of night. No evidence suggests that such a fear creates special needs.
*630 ¶88 Amanda Plumb expressed concern about the size of T.T.’s Las Vegas home. In In re Dependency of D.F.-M., 157 Wn. App. at 193 (2010), a social worker complained that the father’s house had too few bedrooms. This court emphasized that courts, not administrative agencies or individual social workers, are the ultimate evaluators of a parent’s ability to care for his child. The court noted that many children have been happily raised without bedrooms of their own.
¶89 Amanda Plumb registered alarm about Karen, Cathy, and Georgia encountering Mark Gregory at T.T.’s home. On appeal, the State characterizes the potential for the girls seeing Gregory as the most alarming aspect to returning Karen, Cathy, and Georgia to their mother. The State even falsely claims that Gregory subjected all three girls to sexual abuse. This testimony is based solely on hearsay. Only Karen alleged sexual abuse, and authorities concluded the allegation was false.
¶90 Plumb declared: “[F]rom what I’ve gathered, [Andrew] has visits with him [Mark].” CP at 165. Thus, this evidence of any encounter between Mark Gregory and Karen, Cathy, and Georgia is based on more hearsay. The testimony does not even establish the possibility of a visit between Andrew and his father at the T.T.’s home. Assuming any visits, the visits could be at Gregory’s home.
¶91 Even assuming an encounter between Mark Gregory and one or more of the Rees daughters, such is not grounds for creating a dependency. In In re Dependency of M.S.D., 144 Wn. App. 468, 182 P.3d 978 (2008), the trial court ordered a dependency based on the State’s concern that the mother failed to protect her daughter from her boyfriend, Seth Poirer. Poirer had a ten-year-old conviction for assault and criminal mistreatment of his two-month-old baby. The mother’s brother also reported to police that Poirer sexually abused M.S.D. Nevertheless, a physician who examined M.S.D. ruled out sexual abuse. This court reversed the dependency, even after recognizing the appellate principle that this court must affirm the trial court if *631 substantial evidence supports the findings of fact. This court observed that a poor choice of a partner is not a reason for the State to interfere in the life of a family. In this appeal, authorities concluded that Mark Gregory did not abuse Karen.
¶92 In short, Amanda Plumb frets about an immediate return of Karen, Cathy, and Georgia to T.T., but her testimony lacked evidence of T.T. being an incapable parent or that placement with T.T. would cause substantial damage to any of the three daughters. A social worker’s worries should not control dependency law. Plumb declared that she wants “to make absolute sure with an ICPC [study] that these children are gonna be moving back to a safe environment.” CP at 213. Other parents are not subjected to an exacting standard of absolute certainty that the home is a safe environment. T.T. does not deserve this standard applied to her.
¶93 The court commissioner and superior court judge failed to analyze the dependency of the other daughters, Cathy and Georgia, separate from the dependency of Karen. Scant, if any, evidence supported a conclusion that T.T. is incapable of caring for her daughter, Karen. Even less evidence supports a conclusion that T.T. is incapable of caring for the two younger girls, let alone that care by T.T. would substantially damage the girls’ development.
Interstate Compact on Placement of Children
¶94 To excuse the denial of T.T.’s rights to her children, the State, pursuant to the Interstate Compact on Placement of Children, sought an order directing Nevada to investigate the home of T.T. for later placement of Karen, Cathy, and Georgia in the home. Such an order violates the law because the order directs an investigation of a parent’s home, contrary to the terms of the ICPC.
¶95 In In re Dependency of D.F.-M., 157 Wn. App. at 190-91 (2010), this court addressed whether the ICPC ap *632 plies to parental placements. We held in the negative. Alyce Fabian-Miller bore D.F.-M. Six months later, a Washington court entered an order declaring Rico Verner as D.F.-M.’s father. Three years later, the State took D.F.-M. into protective custody because of neglect, domestic violence, and drug use by Fabian-Miller. Thereafter, Verner learned of the dependency and demanded dismissal of the dependency and placement of the child with him at his home in Oklahoma. The State conceded it lacked evidence that Verner was an unfit parent. Nevertheless, the State did not wish to allow placement of D.F.-M. with Verner until Verner’s home state agreed to placement under the ICPC. The trial court ordered D.F.-M. placed with Verner, and Fabian-Miller appealed. The State joined with Fabian-Miller in arguing the provisions of the ICPC should be fulfilled before placement with Verner. This court affirmed immediate placement with Verner in part on the ground that the ICPC did not apply to investigating the capability of a parent.
¶96 A group of state social service administrators drafted the Interstate Compact on Placement of Children in the 1950s to address the problem of providing services to children placed across state lines. The compact seeks to foster cooperation and information sharing among member states so as to ensure that children requiring placement receive the maximum opportunity to be placed in a suitable environment with a desirable degree and type of care. All fifty states, the District of Columbia, and the United States Virgin Islands have adopted the ICPC. Washington enacted the compact in 1971. RCW 26.34.010.
¶97 Under article III of the ICPC, the scope of the compact is limited to placements in foster care or preliminary to an adoption. Article III also sets out the requirements for a valid placement. No sending agency shall send to another state any child for placement in foster care or as a preliminary to a possible adoption unless the sending agency complies with the ICPC, which requires the sending *633 agency to notify the receiving state of the intended placement and to provide such documents as may be necessary to carry out the ICPC’s purposes. The placement may not occur until the receiving state notifies the sending agency in writing that the proposed placement does not appear to be contrary to the interests of the child.
¶98 The ICPC does not define “foster care.” In D.F.-M., we noted that the plain, ordinary meaning of the term is the placement of a child in a substitute home, one other than that of the child’s parents. Under article 11(d) of the ICPC, “placement” means “the arrangement for the care of a child in a family free or boarding home or in a child-caring agency or institution ... and any hospital or other medical facility.” In D.F.-M., we further observed that, although “family free” or “boarding” homes are not defined in the compact, these terms refer to nonparental residential arrangements that provide children with the care usually received from parents. Unlike a boarding home, the care provided by a family free home is free of charge. Based on these observations, we held that the provisions of the ICPC could not be employed to investigate a parent’s home before placement of a child with a parent. The compact applies only to foster care or placements preliminary to possible adoption, neither of which is a parental placement. Because this court ruled based on construction of the compact, we did not address Rico Verner’s alternative argument that application of the ICPC to parental placements violates the due process clause.
¶99 The State seeks to distinguish D.F.-M. on the ground that the Oklahoma father actually saw the children, whereas T.T. has not seen her daughters for three years. No reading of D.F.-M. supports such a distinction being valid. We did not leave any door open to permitting the use of the ICPC in parental placement under other circumstances. The terms of the ICPC admit no exception to its limitation against applying to a parental placement.
¶100 The majority writes that it lacks a record as to the State of Nevada’s ICPC involvement so T.T.’s objection to *634 the application of the compact is premature. The majority’s comment fails to recognize that D.F.-M. holds that Nevada is to have no ICPC involvement. The extent or record of this involvement is immaterial. The trial court ordered involvement contrary to the ICPC that does not apply to parental placements.
¶101 The majority also writes that any prohibition of employing the ICPC for a parental placement does not eliminate cooperation between the two states as the parties work toward reunification. The majority does not explain what cooperation is needed or permissible and why two states would cooperate outside their authority to act. Again, the trial court ordered an ICPC placement review in Nevada, contrary to the interstate compact, state statute, and this court’s decision. A court’s sanctioning of extralegal and unauthorized conduct by a state agency against the will of the legislature creates a dangerous precedent. Therefore, I respectfully dissent.
Review denied at 185 Wn.2d 1026 (2016).